**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

MARIANIST PROVINCE OF THE UNITED
STATES, et al.,                                    )
                                                   )        Case No. 4:17-cv-805-RLU
          Plaintiffs                               )
                                                   )        Hon. Ronnie L. White
v.                                                 )
                                                   )        ***Plaintiffs' Response to***
CITY OF KIRKWOOD, et al.,                          )        ***Defendants' Cross Motion***
                                                   )        ***and Reply for Summary***
          Defendant.                               )        ***Judgment***
                                                   )

## Introduction[1]



The City's argument in opposition to Summary Judgment and in favor of its Cross Motion

for Summary Judgment can be summarized as follows:

- *Yes, we approved lights at St. John Vianney's Sports Field Property based on our error and yes, we waited seven months to tell the school of our error.*

---

[1] A picture of the Sports Field Property, March 5, 2018 at 6:45 p.m.

- *Yes, St. John Vianney prepared a plan for the Sports Field Property complex to meet our lighting ordinance and yes, in response to the plan we changed our ordinance, so the school could not comply with our ordinance.*

- *Yes, we regulate the zoning of public high schools but hold them to a lower standard than religious schools.*

- *However, we believe fault remains with St. John Vianney because it should have known the City was wrong in approving the lights, it should have known the City would change the lighting ordinance to preclude them from complying with it, and we have not inhibited the religious exercise of the school.*

Neither the law nor the facts support the arguments made by the City of Kirkwood (the "City") in its response and cross motion for Summary Judgment.

This case is much more than lights on a field. It is based on St. John Vianney's ("Vianney") mission to inculcate Catholic religious values and truths to the young men of Vianney. A usable lighted field gives Vianney the ability to live its religious mission. The failure to allow a usable lighted field substantially burdens Vianney's religious mission, which is one of the reasons why Vianney pursued this lawsuit.

## Summary of Additional Facts

The facts of this case are set forth in Plaintiffs' Motion for Partial Summary Judgment that was filed with the Court five months ago. See ***Dkt. 58.*** Subsequent discovery has confirmed the following facts.

### a.  Planning to Renovate the Sports Field

Vianney, like many other schools that opened in the St. Louis area 50 years ago, offered a limited number of athletic programs based on the availability of athletic fields. **SUF** ¶ 116. In 2012, Vianney evaluated their existing athletic fields in light of current needs, standards, and the requests of students. Vianney then engaged Stock & Associates to help create a master plan for renovated athletic fields. **SUF** ¶ 117. The religious mission of the school was not discussed with the

contractors as they dealt solely with the fields. **SUF ¶ 118**. This process included reviewing the local community's zoning and ordinance requirements. **SUF ¶ 119**. Through the master plan process, it was discovered that the City had no limitation on athletic field lighting other than limiting the height of the poles which held the lights to 80 feet.  **SUF ¶ 120**.

The project was bid out and Vianney selected a contractor for the Sports Field Property and that entity took on the responsibility of securing permits. **SUF ¶ 121**. The updated Sports Field Property included a turf field and lighting so that Vianney could use the field for baseball as well as lacrosse, soccer and ultimate Frisbee. **SUF ¶ 122**. Being able to offer additional sports on the lighted Sports Field aligns with Vianney's religious mission of giving students more opportunities to grow in the faith.  **SUF ¶ 123**

In April 2015, Stock & Associates prepared a lighting plan for the baseball field. **SUF ¶ 124**  Stock worked with Musco Lighting, the world's leading light supplier for athletic stadiums, to select the lights to be used on the baseball field and develop a photometric plan. **SUF ¶ 125** A photometric plan is a plan that shows the "brightness" of lights as well as "light spillage" on adjacent property. **SUF ¶ 126** Todd Stych, the representative from Musco assigned to the project, noted that there is nothing unique about the Sports Field Property – it is like all others. **SUF ¶ 127**.

b.  *Vianney learns of the City's Lighting requirements.*

On April 24, 2015, representatives from Stock & Associates received a voicemail from Ryan Spencer, City Planner of the City of Kirkwood, in response to an inquiry about the proposed lighting at the Sports Field Property.  **SUF ¶ 128**. Mr. Spencer advised Stock & Associates that the City added a lighting element to its code which limits the offsite light spillage to a maximum foot candle of .1, measured on the ground at the property line. **SUF ¶ 129**. Jacob Buening, a civil engineer for Stock & Associates assigned as the project manager for the Sports Field Property,

testified that the Kirkwood lighting restriction is one of the most restrictive lighting ordinances in the United States with which he is familiar. **SUF** ¶ 130.

Stock & Associates then called Musco Lighting, the lighting engineer, and asked if they could prepare a plan that allows for a safe and usable playing field at Vianney which could comply with the .1-foot candle issue. **SUF** ¶ 131. When asked by Stock & Associates if Musco could reduce the adjacent light spillage, Musco responded that it could not provide a photometric plan that complied with the City of Kirkwood Lighting Ordinance and meet the engineering and safety standards to play baseball, lacrosse, or soccer. **SUF** ¶ 132.

   c.  *The City approves Vianney to light its Sports Field.*

Stock & Associates recommended to Vianney that it apply for a lighting variance before the City of Kirkwood Board of Adjustment. **SUF** ¶ 133. Thereafter, the application was prepared and filed with the City.  **SUF** ¶ 134; ***Exhibit 35.***  The Vianney application for a lighting variance is very clear. ***Id.*** Vainney sought a variance for "new lighting," not "replacement of lights," and included a photometric plan showing the light spillage off of the Vianney property. ***Id.***  Vianney moved forward with ***designing*** the Sport Field with outdoor lights at the same time of applying for a lighting variance. **SUF** ¶ 135.

 Ryan Spencer, the city planner assigned to Vianney's lighting variance request, was charged with reviewing the photometric plan based on the variance request for lighting sought by Vianney. **SUF** ¶ 136. He did his review in his office.  **SUF** ¶ 137. He did not go to Vianney to look at the field to see if lights were on the field. **SUF** ¶ 138.

Spencer reviewed the site by comparing four separate aerial views found on the internet and concluded the Sports Field Property had lights on it. **SUF** ¶ 139. Based on his research, not on a site visit or a review of the application from Vianney that said it was installing "new lights,"

Spencer concluded that Vianney did not require a lighting variance for the Sports Field Property. **SUF** ¶ 140. Prior to contacting Vianney, Spencer called the city attorney and told him what he discovered and the conclusion he reached. **SUF** ¶ 141. Spencer testified that he did not recall receiving any direction from the city attorney. **SUF** ¶ 142. It was believed that the City Attorney was familiar with the Sports Field Property and knew whether lights were on the field or not, as his son went to Vianney and played baseball on the baseball field several years before the call occurred. **SUF** ¶ 143.

After his call to the City Attorney, Spencer called Jacob Buening from Stock & Associates and told him that Vianney did not need a lighting variance and that he would dismiss the application and refund the permit fee. **SUF** ¶ 144. Mr. Buening called him back and asked for the email to confirm his decision. **SUF** ¶ 145.

Spencer agreed and sent the following email:

> *Jacob,*
>
> *Please accept this email as official record.*
>
> *The City of Kirkwood has determined that the proposed variance is not required as the a (sic) currently, non-conforming situation is being made less non-conforming.*
>
> **Please proceed forward with the project.**
>
> *Regards,*
>
> *Ryan Spencer, AICP*

**SUF** ¶ 146; ***Exhibit 39*** (Emphasis added)

Spencer intended for the school to rely on his email as he wrote, "Please accept this email as official record." **SUF** ¶ 147. George Stock, of Stock & Associates, then reasonably relied on Spencer's email to proceed with the project. **SUF** ¶ 148. As Jacob Buening testified, when the City

told him that they could move ahead with the lighting, they did so since the City is the authority on the issue. **SUF** ¶ 149. More succinctly, when they get municipal approval for a project they have no reason to question it. **SUF** ¶ 150.

No one on the Vianney team evaluated the first sentence of the Spencer email as they were pleased with the conclusion that the City now allowed it to install lights on the field.  **SUF** ¶ 151. Todd Stych of Musco Lighting testified that he read the Spencer email. He did not know what the preceding sentence meant, only that they could proceed with the construction.  **SUF** ¶ 152.

    d.  *Vianney moves forward with the light installation.*

Musco and Vianney moved forward with a purchase order for the lighting after receiving the Spencer email. **SUF** ¶ 153. In reliance on the approval, Vianney purchased and installed lights at a cost of no less than $235,000. **SUF** ¶ 154; ***Exhibit 40.*** Vianney then submitted a full blown photometric plan to the City in August 2015 prior to the issuance of its building permit. **SUF** ¶ 155; ***Exhibit 41.***

In the fall of 2015, the City of Kirkwood was alerted that construction of dugouts at the Sports Athletic Field was occurring at Vianney without building permits. **SUF** ¶ 157. Ryan Spencer and Jack Schenck, the building commissioner for the City of Kirkwood, went to inspect the site. **SUF** ¶ 158. This was Ryan Spencer's first trip to Vianney. **SUF** ¶ 159. However, Spencer did not look at light poles. **SUF** ¶ 160. Schenck observed the contractor pouring concrete bases for the light poles as the lights were not up yet. **SUF** ¶ 161. Spencer told Schenck that Vianney was improving the field and upgrading the lighting- meaning they were replacing existing lighting. **SUF** ¶ 162.

Wendell DePhillips, Vianney's lead representative for the renovation project, learned from the City and its own lighting contractor that the general contractor the school hired to renovate the

Sports Field Property was required to secure building permits prior to construction of the dugouts and the installation of the light poles, but did not. **SUF** ¶ 163. In response to the visit from the City of Kirkwood inspectors, Vianney's contractor for the Sports Field submitted a site plan for the renovation of the Sports Field Property, which included a photometric plan, on October 14, 2015. **SUF** ¶ 164; ***Exhibit 44***

The following day, the City had time to review the plan and then issued the building permit to install the lights and complete the field dugouts. **SUF** ¶ 165. Mr. De Phillips went to Kirkwood City Hall to pick up the building permit. **SUF** ¶ 166. He met with Bill Bensing, the planning director for the City of Kirkwood, who spoke with the City Attorney about the permits. **SUF** ¶ 167. DePhillips testified that he heard the City Attorney approve the issuance of the building permits to the planning director and, as a result, the permit was issued so that the lights at the baseball field could be installed. **SUF** ¶ 168.With a permit in hand, Vianney's electric contractor installed the lights. **SUF** ¶ 169.

On December 22, 2015, once the lights were installed at the baseball field, Musco Lighting tested and found that the light spillage was 4.95-foot candles at the property line of the adjacent property owners. **SUF** ¶ 170. On February 3, 2016, the City's Planning and Zoning Committee again informed Vianney it could use the lights. **SUF** ¶ 61; ***Ex. 1*** ¶¶ 56-57. At the same meeting, a question was raised by one neighbor near the school about the lighting at the baseball field. **SUF** ¶ 171.

The City investigated the issue and found out that seven months earlier it had erred in concluding that the baseball field had lights on it and that the new lights were an update. **SUF** ¶ 172.

    d. *The City of Kirkwood stops Vianney from any meaningful use of the lights.*

On February 11, 2016, Planning Director Bill Bensing sent the "Deprivation letter" to Vianney stating that it could not use the lights or and the sound system on the Sports Field Property until a site plan had been approved and the lights complied with Code. **SUF** ¶ 173; ***Exhibit 45.*** This was followed up by a phone call that occurred on February 16, 2016 between the City Attorney and Mike Loyet, the President of Vianney. **SUF** ¶ 174. The City Attorney told Mr. Loyet that the City made a mistake in granting permission to the school to install lights on the Sports Athletic Field. **SUF** ¶ 174. Subsequent letters from the City informed Vianney that they could not rent out the facility until it received approval from the City.  **SUF** ¶ 175; ***Exhibit 46.***

In his 30-year career as the City Planning Director for the City of Kirkwood, Bill Bensing never had a situation where a staff error resulted in the retraction of an approval. **SUF** ¶ 176. Jack Schenck, building commissioner for the City of Kirkwood, was not aware of any time during his working at the City of Kirkwood that the City ever retracted approval for a project. **SUF** ¶ 177. George Stock, Vianney's lead consultant, thought it was total "BS" when the city attorney told Mike Loyet seven months after approval of the project that the City made a mistake in June 2015 when it approved the lights. **SUF** ¶ 178. Jacob Buening, the civil engineer with Stock & Associates, also stated he never had a situation like this in his entire career. **SUF** ¶ 179.

After several months of continued hearings with the City's Planning and Zoning Commission, Vianney submitted a site plan and the City of Kirkwood limited the light usage to the ordinance limitation on the Sports Athletic Field, which, is a level so dim as to limit light spillage to be .1-foot candle, and so limited that it rendered the Sports Field Property unsafe to play sports. **SUF** ¶ 180, **SUF** ¶ 181; ***Exhibit 47, 48***

Further, without any basis in its code of ordinances, the City limited the use of lights to athletic games and practice, ***ONLY,*** and required them to be off at 9:00 p.m. (nine months of the year) or 10:00 p.m., (three months of the year after school is out). **SUF ¶ 182;** ***Exhibit 48*** In addition, without a reference to any code provision, the City limited amplified sound at the Sports Field Property to be used only at athletic games, not practices, and only for pre-game announcements and the national anthem, not music prayer, fellowship and thus precluded it from using the Sports Athletic Property from using amplified sound to simply worship on the field. **SUF ¶ 183;** ***Exhibit 48***

The sound requirements imposed by the Planning and Zoning Commission at the site plan review even though sound is "not within the purview of planning," as sound issues are based on the general "nuisance" ordinance of the City. **SUF ¶ 184.** The City does not have a ordinance directly related to the level of sound, rather, it is dictated by nuisance. **SUF ¶ 185.**

In response to the Planning and Zoning decision, Vianney submitted a variance request to allow full use of the sound and lights, which, included some very severe self-imposed restrictions on lighting and sound to address the concern of adjacent neighbors, along with use and rental. **SUF ¶ 186.** The City's Board of Adjustment unanimously rejected the variance application. **SUF ¶ 187.**

In the late fall 2017, Vianney created a photometric plan that would allow it to meet the City lighting code wherein the existing lights could be used and the light spillage on adjacent property at the property line to be less than or equal too .1-foot candle, the existence of which the City officials had knowledge of. **SUF ¶ 188;** ***Exhibit 51.*** Prior to Vianney's ability to submit the photometric plan for review, and rather than accepting, reviewing and approving Vianney's new photometric plan, the City of Kirkwood amended its lighting code and changed it so Vianney's

9

lighting plan would be rejected as well as any other method of Vianney using its lights as it could never meet the amendments requirements. **SUF** ¶ 189; ***Exhibit 52.***

## Standard of Review

The standard of review for summary judgment is set forth in Plaintiffs' Motion for Partial Summary Judgment. See ***Dkt. 58***. Summary judgment is proper "when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Coates v. Powell*, 639 F.3d 471, 475 (8th Cir. 2011).

## Legal Arguments

## I.     St. John Vianney prevails on the Equal Terms claim under RLUIPA

In moving for summary judgment, the City directs this court to a decision from the United States District Court of New Hampshire, *Signs for Jesus and Hillside Baptist Church v. Town of Pembroke and Hodge*, 230 F. Supp. 3d 49 (2017). This case is not considered leading or even one that has been followed by any other courts as the authority for addressing an Equal Terms claim under RLUIPA.

If this court does not adopt one of the four prevailing Equal Terms tests, as set forth in Plaintiffs' Motion for Partial Summary Judgment, ***Dkt. 58*** at 8–10, then it is important for it to first review the facts of the *Signs for Jesus* case when applying it to the instant case. **SUF** ¶ 190; ***Exhibit 53.*** According to the complaint in that case, the plaintiffs wanted to install an electronic sign on church property located in the Town of Pembroke, New Hampshire. ***Id.*** *at para.14.* While electronic signs are barred in the  zoning district, the town approved two electronic signs: one on property owned by a gas station and the other on property owned by a public school in a residential district. ***Id.*** *at para 17-26.*

After the plaintiff's application for a permit to install an electronic sign was denied, they filed suit seeking a declaration that the Town of Pembroke's sign ordinance was unconstitutional. *Id. at para. 42-44, 58-87, 120-135.*   Relying heavily on the United States Supreme Court case of *Reed v. Town of Gilbert,* 135 S. Ct. 2218 (2015), the plaintiffs argued that several exemptions within the town's zoning ordinance regulate signs based on the *content* or the *purpose* of the sign's intended message and that the sign ordinance impermissibly distinguishes between different *types* of signs. *Id. at para. 58-87, 120-135.*

It is clear from a review of the allegations and claims made in the case, the plaintiffs' case was largely fashioned as a constitutional challenge under the Free Speech and Equal Protection clauses of the United States Constitution, with RLUIPA as an afterthought. *Id. at 58-87, 120-135.* In reviewing the Equal Protection allegations in the complaint, the court found strict scrutiny did not apply to the analysis. When applying intermediate scrutiny to the constitutional claims, the court concluded that a public school was not a valid comparator "because the state has deprived the town of any power to regulate governmental land uses." *Signs for Jesus*, 230 F. Supp. 3d at 67. After dismissing the Equal Protection claim, the court summarily dismissed the RLUIPA Equal Terms claim. *Id.* at 68.

The difference in *Signs for Jesus* and the instant case is that *the City of Kirkwood uses its police powers to regulate public schools, including Kirkwood High School.*   Kirkwood High School considers Vianney generally to be the same. **SUF** ¶ 191. It considers Vianney's use of its Sports Field Property to be the same as Kirkwood High School's use of the baseball field. **SUF** ¶ 192. According to Michael Romay, an employee of the Kirkwood School District who was designated to testify in this case, Kirkwood High School "is subject to the zoning regulations of the City of Kirkwood." **SUF** ¶ 193.

11

The City of Kirkwood treats the public high school (Kirkwood High School) differently than the private religious high school (Vianney) in the following ways:

- *Site plan review*:

  - The City did not require Kirkwood High School to go through site plan review for the natatorium. **SUF** ¶ 194.

  - The City did require Vianney to go through site plan approval. **SUF** ¶ 195.

- *Building permits*:

  - The City did not place conditions on approval of building permits for Kirkwood High School. **SUF** ¶ 196.

  - The City did imposed conditions on Vianney on its building permits. **SUF** ¶ 197.

- *Lighting*:

  - The City did not impose restrictions on the hours, brightness and purpose on the parking lot lights at the natatorium of Kirkwood High School. **SUF** ¶ 198

  - The City did impose restrictions on the hours, brightness and purpose of the lights on Vianney at its Sports Athletic Field. **SUF** ¶ 199, ***Exhibit 56***

- *Rental and use*:

  - The City of Kirkwood does not restrict Kirkwood High School from renting of its athletic fields. **SUF** ¶ 200.

  - The City of Kirkwood did restrict the use of Vianney to rent out its Sports Athletic Field. **SUF** ¶ 201, ***Exhibit 57***

- *Sound*:

  - The City does not restrict amplified sound at Kirkwood High School's baseball field. **SUF** ¶ 202.

  - The City does restrict the amount , the time and the purpose of amplified sound at Vianney's Sports Athletic Field by placing severe restrictions on its use. **SUF** ¶ 203, ***Exhibit 56.***

Thus, Kirkwood High School is a valid similarly situated secular comparator. Yet there is *one* main difference between Vianney and Kirkwood High School. The educational services Vianney provides are inherently religious while the educational services Kirkwood High School

provides are secular. **SUF** ¶¶ 2-4, 90. By applying its land use regulations to Vianney, a Catholic school, but not the secular Kirkwood High School, the City has treated Vianney on less than equal terms with a non-religious assembly. As a result, Vianney has established a *prima facie* as-applied Equal Terms violation.

In *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1230-31 (11th Cir. 2004), the Court made no mention of less than equal treatment as measured against any "regulatory purpose" or "criteria"; it simply stated that unequal treatment is unlawful. The reason is that the text of RLUIPA does not include the "regulatory purpose" or "criteria" element. See 42 U.S.C. § 2000cc(b)(1). The *Midrash* Court confirmed that Congress demanded a broader interpretation of RLUIPA based on its inclusion in the statutory text that RLUIPA must be "construed in favor of a broad protection of religious exercise, *to the maximum extent* permitted[.]" 42 U.S.C. 2000cc-3(g) (emphasis added). Giving governments an extra layer of protection by adding a "regulatory purpose" or "criteria" test is not construing RLUIPA as broadly as possible. Thus, the Eleventh Circuit's test in *Midrash* is truest to the text and intent of RLUIPA.

All Equal Terms tests require a plaintiff to show four elements: (1) there must be an imposition or implementation of a land use regulation, (2) by a government, (3) on a religious assembly or institution, and (4) the imposition or implementation must be on less than equal terms with a nonreligious assembly or institution. *See* 42 U.S.C. § 2000cc(b)(1). Here, the first three elements are not in issue. There is no question that Vianney is a religious institution[2] and the City has imposed a land use regulation—the Lighting Regulations, Sound Regulations, Site Plan Regulations, and Variance ordinance—upon Vianney. **SUF** ¶¶ 19-27, 34-38, 43-45, 55-89.

---

[2] http://bit.ly/2oJvUCo  ("RLUIPA's land-use sections provide important protections for the religious freedom of persons, places of worship, ***religious schools***, and other religious assemblies and institutions."); *Westchester Day Sch. v. Mamaroneck,* 504 F.3d 338 (2d Cir. 2007); *Acad. of Our Lady of Peace,* 2010 WL 1329014 (S.D. Cal. Apr. 1, 2010).

The only remaining question is whether the City's implementation of the land use regulation was on less than Equal Terms with a nonreligious assembly or institution.

The facts as set forth above clearly confirm that Vianney has established the discrimination. The Eleventh Circuit has also held an Equal Terms violation is subject to strict scrutiny. *Midrash*, 366 F.3d at 1232. Thus, the conduct will only be upheld if it was a "narrowly tailored means of achieving a compelling government interest." *Id.* The City cannot satisfy this stringent standard.

Here, the City's reasons for treating Vianney differently than Kirkwood High School are both similarly unconvincing. Vianney and Kirkwood High School are located in the R-3 Single-Family Residential District. **SUF ¶¶ 20, 91.** The purpose of the R-3 district is "to encourage and preserve medium density detached single-family residential and allow for certain neighborhood facilities such as churches and similar places of worship, parks and schools that are not detrimental to the residential environment." **SUF ¶ 92;** ***Ex. 25***. While the City has allowed Kirkwood High School to operate outdoor athletic fields with lights and sound amplification in the R-3 District without interference, it has affirmatively inhibited Vianney from doing the same. **SUF ¶ 198-202.** The City has also restricted Vianney's ability to rent its facilities by sending it two Use Determination Letters while allowing Kirkwood High School to rent out its facility without restriction. **SUF ¶¶ 82-87, 200-201;** ***Exs. 20-21***. There is no compelling interest for this blatantly differential treatment.

As the court recognized in *Catholic Archbishop*, high schools with outdoor athletic facilities—be they secular or religious—implicate similar parking, traffic, light, glare and noise concerns. 28 F. Supp. 3d at 1169. In fact, Vianney has an enrollment of approximately 600[3]

---

[3] https://high-schools.com/directory/mo/cities/kirkwood/st-john-vianney-high-school/00752287/

students whereas Kirkwood High School has an enrollment of approximately 1,782[4] students. By virtue of its significantly larger student body, Kirkwood High School offers *more* athletic programs (for men and women, while Vianney is all-male) and thus implicates more parking, traffic, and noise concerns than Vianney. Nonetheless, as in *Catholic Archbishop*, the City unilaterally reversed its initial approval and forced Vianney to prepare and submit various applications to the City to use the lights and sound system at its Sports Field Property. Despite Vianney's compliance, the City placed severe limitations on the use of the lights and sounds system pursuant to the site plan restrictions and still outright denied its variance which would have allowed Vianney meaningful use of the lights while addressing neighboring resident concerns. **SUF** ¶ 81, 204; **Exhibit 56** Yet Kirkwood High School is able to light its natatorium parking light without restriction from the City. **SUF** ¶ 198. Following the reasoning in *Catholic Archbishop*, it is clear in this case the City has treated Vianney on less than equal terms with Kirkwood High School.

Therefore, there is no genuine issue of material fact the City has violated RLUIPA's Equal Terms Clause as applied to Vianney.

## II.   The Court should enter summary judgment on Plaintiffs' Substantial Burden claim under RLUIPA and Missouri RFRA.

To recap, RLUIPA's Substantial Burden clause provides as follows:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

    (A) is in furtherance of a compelling governmental interest; and
    (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

---

[4] https://www.usnews.com/education/best-high-schools/missouri/districts/kirkwood-r-vii/kirkwood-sr-high-11713.

The Missouri Legislature adopted its own version of RLUIPA through its Religious Freedom Restoration Act ("RFRA"), which provides as follows:

1. A governmental authority may not restrict a person's free exercise of religion, unless:

    (1) The restriction is in the form of a rule of general applicability, and does not discriminate against religion, or among religions; and

    (2) The governmental authority demonstrates that application of the restriction to the person is essential to further a compelling governmental interest, and is not unduly restrictive considering the relevant circumstances.

2. As used in this section, "exercise of religion" shall be defined as an act or refusal to act that is substantially motivated by religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious belief.

3. As used in this section "demonstrates" means meets the burden of going forward with the evidence and of persuasion.

Section 1.302, R.S. Mo. Under both RLUIPA and the Missouri RFRA, Vianney must first show the City has implemented a land use regulation that imposes a substantial burden on its religious exercise; the burden then shifts to the City to show the burden furthers a compelling government interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-2(b); Section 1.302, R.S.Mo.

### a.   Athletics is part of the Religious Exercise at Vianney

The City argues that its actions did not "substantially burden religious exercise" because it does not believe "religious exercise" is at issue in this case. This argument must be rejected. When asked at his deposition to "*Describe for me if you would, Mr. Loyet, how baseball and soccer in your judgment are a religious activity?*" Vianney's President Michael Loyet eloquently responded:

> It's going to be a long answer.  So, one of the tenants of the characteristics of Marianist education -- well, five of them, and you've seen that in print already -- but the formation in faith, the integral quality education, the family spirit, the service, justice, and peace, and adaptation and change are five pillars of our Marianist faith.

16

Athletics are a significant part of the educational process. And so, when you talk about any program athletically, that is helping us to form our young men. That's part of that personal excellence in the Catholic Marianist tradition that's part of our mission.

So every opportunity we get to work with the young men in athletics is helping us to fulfill that mission.[5] **SUF** ¶ 202.

Vianney's efforts to update its Sports Field Property qualify as "religious exercise" under RLUIPA. Congress broadly defined "religious exercise" to include "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief," and further specified the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7).

Congress further clarified RLUIPA is to be construed "*to the maximum extent permitted by the terms of this chapter and the Constitution*" 42 U.S.C. § 2000cc-3(g). All sincere religious beliefs are protected. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) ("[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). Further, "the exercise of religion involves

---

[5] While the City takes great pride at pointing out some parts of the deposition testimony of Mr. De Phillips concerning his understanding of the mission of the school, they neglect to inform the Court of this important fact that he testified to at his deposition: *"As far as discussions about the mission and about whether we could or couldn't, my role is very different than Mike Loyet's. My role does not, not include, my responsibilities do not include discussions about the mission and all those kind of things. My role, my role is to deal with the construction and deal with the contractor and deal with moving the project forward. . . . Mine is not a mission – my responsibilities don't include furthering of the mission. All employees of Vianney are there to further the mission. Not my primary responsibility . . . of the project."* **SUF** ¶ 203. *"And to go back to it, I, you know, I – my role is not to get involved with the mission and all those kind of things. My role was to get this thing built."* **SUF** ¶ 203.

not only belief and profession but the performance of…physical acts that are engaged in for religious reasons." *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2770 (2014).

As stated previously, Vianney is dedicated to forming young men for spiritual, academic, and personal excellence in the Catholic Marianist tradition. **SUF** ¶ 202. Vianney student athletes use the sports field property to evangelize and share their Catholic Marianist faith. **SUF** ¶ 12, 202; *Ex. 1* ¶ 9. Indeed, Vianney's sports conference, the Metro Catholic Conference, consists of five all male Catholic high schools  -  more proof that athletics are an integral part of the formation. https://bit.ly/2q7SO8g. The ability to reach more young men and raise them in the Catholic faith through the formation in faith, the integral quality education, the family spirit, the service, justice, and peace, and adaptation and change, the five pillars of the Marianist faith is at stake in this case.

Vianney is not the first to argue that sports help reach, grow and connect young men in their faith formation. Our Catholic Church and church leader (the Pope) supports using sports as a means to reach, connect and grow youth. For example, there is a Catholic movement called,  **"Sport at the Service of Humanity."**  It has as its vision of a "global movement that inspires every organization and participant in Sport to live, think and act in accordance with the stated Declaration of [Catholic] Principles." http://sportforhumanity.com  Further, the **Pontifical Council for Culture** describes a department within the Vatican that is established to promote Culture and Sport. https://bit.ly/2pWDgUC  It outlines the objectives of the department which includes "Bring together the saving message of the Gospel and the world of sports, in order to open it up further to the Christian faith, which creates culture." *Id* The Vatican has an office called **Dicastery for Laity, the Family and Life** that promotes the value of sports in our Catholic Church. https://bit.ly/2GQ0QwP

As explained by **Catholic Athletes for Christ,** https://bit.ly/2H6hnun, the Catholic tradition that celebrates, teaches and uses athletics to promote the following:

A. *Charity.*   Charity is the virtue of putting others before ourselves. In sports, this means learning to care about those around us, even our competitors, and treat each person we meet not only how we would want to be treated ourselves, but moreover how Jesus Christ would treat them if He were present. *"Perfect love means putting up with other people's shortcomings, feeling no surprise at their weaknesses, finding encouragement even in the slightest evidence of good qualities in them.*" — St. Therese of Lisieux

B. *Honesty.*   Honesty is the virtue of being conformed and dedicated to the truth. This is a truth that exists outside of our own human mind, a truth that we get the grace of participating in every time we read sacred scripture or participate in the sacred mysteries. *"No one is truly poor but except the one who lacks the truth.*" — St. Ephraem the Syrian

C. *Humility.*   Humility is the virtue of being aware that God is the author of all good and the realization that we are not God. In other words, we should seek to give credit to God who is the source of all that is good and seek to do all things for the greater glory of God, rather than taking credit for His handiwork. *"Have among yourselves the same attitude that is also yours in Christ Jesus, who, though He was in the form of God, did not regard equality with God something to be grasped."* Philippians 2:5-6

D. *Meekness.* Meekness in athletic competition is not capitulation or timidity; it is the spiritual strength to help your competitors over the bar that you raise by winning.  We should all seek the strength of character in fortitude and courage to turn anger inward to maximize the gifts that God gives us rather than trying to tear down our competition. In order to take meekness to the next level, we must compete in such a charitable way that we actually make our opponent better too. *"Meekness is a virtue which moderates the passion of anger according to the dictates of reason and calms the desire for revenge."* – St. Thomas Aquinas

E. *Moderation.*   Moderation, also known as temperance, is the virtue of being in control of our passions and having self-mastery. We should have the ability to tell ourselves "No" and be in control of our appetites for the things of this world and the simple pleasures of life. *"Do not follow your lusts but restrain your base desires. If you allow yourself to satisfy your desires, this will make you the laughing-stock of your enemies. Do not indulge in luxurious living, nor get involved in such society."* Sirach 18:30-32

F. *Purity.*   Purity, also known as chastity, is the virtue of being clean in mind and body, as well as modest in our dress and speech. We are not to deny our human sexuality, but rather embrace it, accept it, and integrate it into our very person through the use of temperance. *"Avoid Immorality. Every other sin a person commits is outside the body, but the immoral person sins against his own body. Do you not know that your body is a temple of the Holy Spirit within you, and that you are not your own?"* — 1 Corinthians 6:18-19

G.  *Sportsmanship.* Good sportsmanship is the virtue of treating others with dignity and respect in sporting events; winning with graciousness and losing with dignity and honor. Our behavior should reflect at all times that of Christ and our demeanor speak to the value of healthy competition. Instead of looking for the easy way to win or resort to cheating, being a good sport means that there are no shortcuts to victory. *"I have competed well; I have finished the race; I have kept the faith."* 2 Timothy 4:7

All of these sources and many more support the fact that athletics play an integral part in the Catholic faith and our formation of individuals and supports our argument that athletics are a sincerely held belief in our faith.

In sum, Vianney's efforts to update the Sports Field Property in order to enhance its ability to evangelize and engage in religious fellowship, prayer and worship clearly meet RLUIPA's definition of "religious exercise."

> b.  *The City has substantially burdened Vianney's religious exercise*

In moving for summary judgment, the City principally relies on *Living Water Church of God v. Charter Township of Meridian, Michigan,* 258 Fed. Appx. 729; 2007 U.S. App. LEXIS 28825 (6th Cir. 2007), an unpublished opinion from the Sixth Circuit Court of Appeals. Significantly, ***no Court in the nation over the past decade*** has followed the *Living Water* decision with respect to defining the term "substantial burden" under RLUIPA. In *Living Water*, the church sought to expand their family life center for religious worship. The District Court found that the denial of a special approval and use was a substantial burden on the church's religious exercise. The Sixth Circuit Court of Appeals reversed. Rather than adopting a test or defining the term "substantial burden," the Court held:

> We return to the issue as we framed it earlier in this analysis: although the government action may make *Living Water*'s religious exercise more expensive or difficult, does that government action place substantial pressure on *Living Water* to violate its religious beliefs or effectively bar the church from using its property in the exercise of its religion? We conclude that the Township's denial does neither.

*Living Water*, 258 Fed. Appx. at 739. ***No federal appellate courts have adopted this definition of***

*"substantial burden" since the release of the unpublished decision over a decade ago*. The reason

is clearly set forth in the concurrence of Judge Moore – the criteria used by the Sixth Circuit sets

an impossible burden; a showing that that *religious exercise is barred* as a result of the local zoning

denial.  As Judge Moore noted:

> I concur in the judgment of the majority opinion and write separately because I
> disagree with some of the analysis therein. . . . Although the majority opinion does
> not purport to commit to any one particular definition, the opinion does suggest a
> specific formulation of the substantial-burden standard by posing the question:
> "although the government action may make [a religious institution's] religious
> exercise more expensive or difficult, does that government action place substantial
> pressure on [the religious institution] to violate its religious beliefs or effectively
> bar the church from using its property in the exercise of its religion?" Majority Op.
> at 18. *No other circuit has advanced this precise standard, and I think this
> formulation is inadvisable. The latter part of this formulation, concerning a
> hypothetical bar on the use of a religious institution's property, is so broad as to
> swallow the substantial-burden inquiry. Were a religious institution to bring an
> RLUIPA claim in the case that a land-use regulation bars the use of its property,
> the question we must then decide is whether that bar constitutes a substantial
> burden.* (Emphasis added.)

*Id.* at 742. While RLUIPA does not define the term "substantial burden," Congress has instructed

that RLUIPA must be broadly construed. *See* 42 USC § 2000cc-3(g). Other case law is instructive

on defining a "substantial burden." According to the Ninth Circuit, a substantial burden is

"oppressive to a significantly great extent" or that puts "substantial pressure" "to

modify…behavior and to violate…beliefs." *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*,

456 F.3d 978, 988 (9th Cir. 2006) (internal quotation marks omitted). Permit denials meet this

standard when they leave a religious institution with "no ready alternatives, or where the

alternatives require substantial delay, uncertainty, and expense." *Int'l Church of Foursquare

Gospel v. City of San Leandro,* 673 F.3d 1059, 1068 (9th Cir. 2011).

The Eleventh Circuit has held "a substantial burden can result from pressure that tends to

force adherents to forego religious precepts or from pressure that mandates religious conduct."

*Midrash*, 366 F.3d at 1227. The Fourth Circuit has noted "a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior." *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 556 (4th Cir. 2013). Likewise, the Second Circuit found a substantial burden where the zoning decision at issue "was characterized…by an arbitrary blindness to the facts." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 352 (2d Cir. 2007).

Decisions from this court that define "substantial burden" under the Missouri RFRA are also instructive. This court has held government action amounts to a substantial burden "if it (1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent...to engage in conduct contrary to a sincerely held religious belief." *Archdiocese of St. Louis v. Burwell*, 2014 U.S. Dist. LEXIS 88918 at *15 (E.D. Mo. June 30, 2014).

Here, as Vianney's President Michael Loyet emphasized in his deposition testimony, an essential tenet of Vianney's Marianist Catholic education involves engaging in religious fellowship through athletic events. **SUF ¶¶** 3-5, 12-13; *Ex. 1* **¶¶** 3-4, 9; *Exs. 2-3*. Vianney has also made clear it sought to install lights and the sound system at the Sports Field Property in an effort to enable its students to evangelize and engage in religious fellowship, prayer, and worship during outdoor athletic events. **SUF ¶¶** 24-25; *Ex. 1* **¶¶** 11-12. In June 2015, the City gave Vianney repeated permission to install the Lights. **SUF ¶¶** 39-41; *Ex. 1* ¶ 22; *Ex. 9* at 3-4. In reliance on this permission and after receiving a City-issued building permit, Vianney installed the Lights, which cost a total of no less than $235,000 for purchase and installation. **SUF** ¶ 42-47; *Ex. 1* **¶¶**

23-24; *Ex. 12*. On February 3, 2016, the City's Planning and Zoning Commission again informed Vianney it could use the lights. **SUF** ¶ 61; *Ex. 1* ¶¶ 56-57.

Yet less than two weeks later, ***seven months after the initial approval***, the City unilaterally reversed its approval and barred Vianney from using the lights or sound system without site plan approval. **SUF** ¶ 60; *Ex. 13*. Vianney complied and submitted a code-complaint photometric plan in connection with its previously submitted site plan, and the City approved the site plan subject to several severely restrictive conditions in September 2016 which essentially eliminates non-athletic religious uses for the lighted field. **SUF** ¶¶ 64-69; *Ex. 15*. Soon after, Vianney submitted a variance request seeking limited use of the lights and sound system that would allow illuminated levels for safe game play. **SUF** ¶ 70; *Exs. 16-18*. Vianney also voluntarily agreed to several proposed variance conditions in order to address light spillage and sound to address the concerns of the City. **SUF** ¶ 75; *Ex. 19*; **Dkt. 26-12** at 7. Nevertheless, the City rejected the proposed variance conditions and outright denied the variance. **SUF** ¶ 81.

As a direct result of the City's contradictory and unjustified actions, Vianney is now barred from making any meaningful use of the lights it spent at least $235,000 to purchase and install. **SUF** ¶ 99; *Ex. 1* ¶ 38. Because it cannot use make any meaningful use of the lights at the Sports Field Property, Vianney is unable to accommodate the necessary practices and home games for participants in its baseball, lacrosse, ultimate Frisbee and soccer programs. **SUF** ¶¶ 14-16, 99-102; *Ex. 1* ¶¶ 11-13, 38-41.

This arbitrary decision by the City has placed substantial pressure on Vianney and its students to fully live out their religious beliefs as they must to modify their behavior to conform to the indiscriminate rules of the City. *Guru Nanak*, 456 F.3d at 988. The young men of Vianney cannot fully uphold their Mission Statement and several integral aspects of a Marianist education

because they do not have the necessary access to the Sports Field Property to participate in athletic and other events that  provide them with the opportunity to live out their Marianist tradition and mission. **SUF ¶¶** 3-5; *Ex. 1* **¶¶** 3-4; *Ex. 2*; *Ex. 3*.

Simply, the City's actions in depriving them the use of the field through its subjective and capricious decisions, has resulted in it forcing Vianney current and future students to forego multiple religious precepts and modify their behavior. *Midrash*, 366 F.3d at 1227. As such, Vianney students cannot participate in conduct motivated by their sincere religious beliefs. *Burwell,* 2014 U.S. Dist. LEXIS 88918 at *15.

In sum, there is no genuine issue of material fact the City has substantially burdened the religious exercise of Vianney and its students.

c. *The City does not have any compelling government interests to justify imposing the substantial burden.*

Once the court finds a municipality's actions impose a substantial burden on religious exercise, the burden shifts to the municipality to prove imposing the substantial burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b). Compelling interests are "interests of the highest order." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such interests include protecting public health, safety, or welfare. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). "Demonstrating a compelling interest and showing that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997). The standard "is not watered…down but really means what it says.'" *Lukumi*, 508 U.S. at 546. Thus, the government must "show a compelling interest…in the particular case at hand, not a compelling interest in general." *Westchester*, 504 F.3d at 353.

The City cannot show a compelling interest in this case. When asked at deposition what the compelling governmental interest is in the .1-foot candle lighting, the City representative merely said, "protecting the adjacent neighbors." **SUF** ¶ 204. However, in looking around metro St. Louis, the vast majority of schools have lighted fields adjacent to residential areas and have lived in harmony for decades. https://bit.ly/2q7SO8g.

Seven months after granting Vianney permission to install and use the lights, the City unilaterally revoked Vianney's ability to use the lights and demanded Vianney go through site plan review. **SUF** ¶ 60; ***Ex. 13***. Vianney voluntarily complied even though another City official conceded that use of the sound system is not even "under the purview of the City's Planning and Zoning Commission as part of the site plan review process" **SUF** ¶ 63; ***Ex. 14***. The Planning and Zoning Commission continued to demand site plan review and ultimately approved Vianney's Site Plan subject to many extremely restrictive Site Plan Conditions related to use of the lights and sound system. **SUF** ¶¶ 68-69; ***Ex. 15***.

In reaching their conclusions, the Planning and Zoning Commission outlined <u>no</u> interests "of the highest order" it sought to protect by implementing the Site Plan Conditions. ***Ex. 15***; *Lukumi*, 508 U.S. at 546. Vianney then submitted a variance to the Board of Adjustment and voluntarily agreed to several proposed variance conditions that would restrict use of the lights and sound system to improve the situation for adjacent residents while allowing Vianney meaningful use of the lights and sound. **SUF** ¶ 75; ***Ex. 19***. The Board of Adjustment rejected all of the proposed variance conditions and instead unanimously denied the variance. **SUF** ¶ 81. In so doing, the Board of Adjustment offered <u>no</u> interests "of the highest order" that were protected by outright denying Vianney's variance. *Lukumi*, 508 U.S. at 546.

25

While the City may assert a general interest in protecting the health and safety of its residents, such an assertion is inadequate; the City must show a compelling interest "in the particular case at hand" *Westchester*, 504 F.3d at 353. It has failed to do so. Thus, any interests the City may assert are purely abstract and certainly not "interests of the highest order" that justify restricting Vianney's religious exercise. *Lukumi*, 508 U.S. at 546.

### d. *The City did not use the least restrictive means of furthering its interests*

Even if the City could show a compelling interest, it must also show it employed the least restrictive means of furthering that interest. 42 USC § 2000cc(a)(1)(B). The least restrictive means requirement is even more stringent than strict scrutiny's narrow tailoring requirement. *Bd. of Trs. v. Fox*, 492 U.S. 469, 477-78 (1989). The municipality must show "[there are] no alternative forms of regulation" that would further its purported interests. *Sherbert,* 374 U.S. at 407. "If a less restrictive means is available for the Government to achieve its goals, the Government ***must*** use it." *U.S. v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 815 (2000) (emphasis added). The City must produce actual evidence its actions were the least restrictive possible actions it could have taken to further its interests in this case. *Fegans v. Norris,* 537 F.3d 897, 904 (8th Cir. 2008).

The City cannot do so. Vianney voluntarily agreed to the proposed variance conditions, which Vianney believed addressed the typical neighbors' concerns about the lights and sound system. **SUF** ¶ 75; ***Ex. 19***; **Dkt. 26-12** at 7. If the Board of Adjustment was not satisfied with the proposed variance conditions, it could have crafted its own conditions.

Instead of doing so, the Board of Adjustment chose to outright deny the variance and prohibit Vianney's meaningful use of the lights. **SUF** ¶ 81.

Clearly there were alternative forms of regulation available to the City—the proposed variance conditions or its own conditions as part of the variance approval. *Sherbert*, 374 U.S. at

407. As such, the City "must use" the less restrictive means. *Playboy*, 529 U.S. at 815. By failing

to do so, there is no question the City did not use the least restrictive means of furthering its

interests. There is no genuine issue of material fact the City has violated Vianney's rights under

RLUIPA's Substantial Burden Clause. As such, plaintiffs are entitled to judgment as a matter of

law on Count IV of their First Amended Verified Complaint.

### III.   Plaintiffs are entitled to summary judgment on their First Amendment free speech claim

Plaintiffs are also entitled to summary judgment on Count VI of their First Amended

Verified Complaint for the same reasons set forth in their pending Motion for Partial Summary

Judgment. The response and cross motion filed by the City contest the arguments raised by

Vianney but tell us nothing new. As such, Vianney relies on its arguments in support of partial

summary judgment as its reply and response to the cross motion for summary judgment.

### IV.   Inverse Condemnation (Count II)

A claim for inverse condemnation arises from a provision in the Missouri

Constitution, which provides that private property shall not be taken <u>or damaged</u> for public use

without just compensation. Mo. Const. art. 1, § 26; *Dynasty Home, L.C. v. Public Water Supply

Dist. No. 3 of Franklin County, Missouri*, 453 S.W.3d 876, 879 (Mo. Ct. App. 2015) (emphasis

added). A prima facie case is made by a plaintiff seeking this relief by proving: (1) action by a

governmental entity; (2) the action permanently or temporarily takes or damages a valueable

property right of the plaintiff; (3) the action is for a purpose that is of an ongoing or continuing

benefit to the public, i.e., for public use; and (4) there is no compensation to plaintiff. *Byrom v.

Little Blue Valley Sewer Dist.*, 16 S.W.3d 573, 101 A.L.R. 5th 711 (Mo. 2000). The definition of

property includes not only ownership and possession but also the right to use and enjoy the

property for lawful purposes. *Labrayere v. Bohr Farms, LLC*, 458 S.W.3d 319, 329 (Mo. 2015).

Damages to personal property, such as Vianney's lights and the sound system, are compensable in an inverse condemnation proceeding because "[t]he prohibition on taking or damaging personal property stems from constitutional, not statutory law." *Shade v. Missouri Highway and Transportation Com'n*, 69 S.W.3d 503, 516 (Mo. Ct. App. 2001).

Vianney has established each of the elements of its claim for inverse condemnation.  It is undisputed that through a series of acts, the City, a governmental entity, barred Vianney from any meaningful use and enjoyment of the lights and sound system on the Sports Field Property without compensating Vianney.

The City's argument contained in its memorandum in support of its motion for summary judgment on Count II is misplaced.  The City erroneously submits  that Vianney bases its claim for Inverse Condemnation on  the City's mere ability to legally enforce lighting regulations, which better serves the City's arguments. However, Vianney's claim for Inverse Condemnation does not arise from the City's enforcement of the lighting regulations, alone, but rather upon (1) the City's retraction of its earlier approval of the lights and subsequent prohibitions of Vianney's use of the lights and sound system despite  its repeated assurances that the lights were approved and Vianney's reasonable reliance thereon in  purchasing and installing the lights, (2) the City's imposition of unreasonable and unprecedented site plan restrictions on the lights and sound system, and (3) the City's Board of Adjustment's denial of Vianney's variance, all of which severely deprived Vianney of any meaningful use of the lights and sound system. **Dkt. #26 ¶¶** 80-87.

While it may be true that a city's valid exercise of its police powers is not a taking of private property for public use when such exercise of the police power is *valid*, an unreasonable exercise of a City's police powers can constitute an inverse condemnation of private property. *Heuer v.*

*City of Cape Girardeau*, 370 S.W.3d 903, 914-915 (Mo. Ct. App. 2012). "A city's police power is expressly delegated from the State by statute, enabling the City to regulate *in order to protect the public, health, safety and welfare*." *Id.*; *see Miller v. City of Town and Country*, 62 S.W.3d 431, 437 (Mo. Ct. App. 2001) (emphasis added). However, a city's police power is limited by, among other things, the necessity of a legitimate public purpose, a reasonable exercise of the police power, and the authority delegated to the city by the applicable statute or ordinance. *Id.*; *City of Kansas City v. Jordan*, 174 S.W.3d 25, 41 (Mo. Ct. App. 2005) (*citing President Riverboat Casino –Mo., Inc. v. Mo. Gaming Comm'n*, 13 S.W.3d 635, 641 (Mo. 2000).

The City's argument that the lighting regulations are a simple use of its police power, which cannot constitute a taking, misses the point. The City bases its argument upon the alleged reasonableness of the lighting regulations and the enforcement of the same being a simple use of its police power, which therefore, does not constitute a taking. The City, however, conveniently ignores the *series* of unreasonable actions undertaken by the City which damaged Vianney's Sports Field Property and prohibited any meaningful use of the lights. The issue is not whether or not the lighting regulations are reasonable, it is whether the method of exercise of the City's police powers was reasonable. The City approved the lights, and, in reliance upon this approval and the repeated assurances by the City, Vianney purchased and installed the lights that it is now prevented from using in any meaningful way. After the lights were purchased and fully installed, the City issued the deprivation letter instructing Vianney that it could not use the lights without the City's approval of the site plan and compliance with the zoning code, including the lighting regulations. The City's enforcement of the lighting regulations at this point – seven months after the City's initial approval of the lights and four months after Vianney's purchase and installation of the lights –prohibited any meaningful use of the lights for their intended purpose, i.e., safe play of competitive sports at

29

night. **SUF ¶ 208**. The City knew it had committed a mistake  due to its own carelessness, as evidenced by the testimony of Ryan Spencer, yet the City still proceeded to prohibit Vianney from all meaningful use of its property, which unreasonably appropriated Vianney's property rights. **SUF ¶ 209**.

In an effort to obtain use of the lights and sound system and to set the stage for the filing of a variance, Vianney submitted a revised photometric  plan in connection with its site plan, which reduced illumination levels so as to comply with the lighting regulations but which were only marginally safe for some athletic practices. **SUF ¶ 210**.  To add insult to injury, the City's Planning and Zoning Commission subsequently further restricted the use of the lights and sound system in its approval of the site plan. **SUF ¶ 199, 203**. This added a number of stringent restrictions and conditions on Vianney's use of the lights and sound system, including and without limitation, several restrictions on the times during and purposes for which the lights and the sound system on the Sports Field Property may be used.  **SUF ¶ 204, *Exhibit 56***.

The Site Plan Conditions imposed on the Sports Field Property by the City were beyond any authority found in the lighting regulations and sound regulations the revised site plan submitted by Vianney complied with all requirements of the lighting and the sound regulations, as applicable.  The site plan conditions were an unreasonable and excessive use of the City's police power in enforcing the lighting regulations and the sound regulations. **SUF ¶ 23-26, 68; SUF Ex. 4-5**.

Further, the board's denial of the variance also constituted an unreasonable use of the City's police power under the circumstances, namely the City's earlier mistake. A city's exercise of police powers is legitimate only if it supports the health, safety, peace, comfort, and general welfare of its inhabitants. *Heuer*, 370 S.W.3d at 914-15; *Miller*, 62 S.W.3d at 437. Vianney's proposed

variance conditions, which were included as part of Vianney's variance request, were not only very reasonable but actually improved upon the site plan conditions imposed by the City (albeit excessive and unreasonable) with regard to the health, safety, peace, comfort, and general welfare of the residences adjacent to the Sports Field Property. **SUF ¶ 186.** Indeed, Vianney's proposed variance conditions were much more  more protective of the health, safety, peace, comfort, and general welfare of adjacent residents because, among other things, they prohibited any and all use of the lights for seven months out of the year, as opposed to the City's site plan conditions which allowed at least some use of the lights all 365 days of the year. **SUF ¶ 70, 76**.

Nevertheless, the City's board of adjustment unanimously denied the variance. **SUF ¶ 82.** The denial was an unreasonable exercise of the City's police power because it both ignored the opportunity to enforce the lighting regulations and implement the proposed variance conditions that would better protect the health, safety, peace, comfort, and general welfare of the adjacent residences and provide substantial justice to all parties.

While it is true that Vianney can continue to use the Sports Field Property during the day, this does not negate the fact that the City has severely restricted Vianney from using the lights and the sound system. As a result of the deprivation letter and the site plan conditions imposed by the City and denial of the variance, Vianney's use of the lights, the sound system, and therefore, the Sports Field Property at night, are restricted in the following ways: (a) prohibiting Vianney's use of the lights at an illumination level to allow for the safe play of games at night; (b) only allowing use of the lights for athletic games and practices and for no other purpose (even though the lighting regulations contain no such purpose restrictions on the use of lighting); (c) prohibiting use of the lights after 9:00 p.m. or 10:00 p.m., depending on the time of year (even though the lighting regulations contain no such time restrictions on the use of lighting); and (d) only allowing use of

the sound system for pre-game announcements and playing of the National Anthem at athletic games, i.e., no use at practices, during game play, or other school events (even though the sound regulations contain no such conditions on the content of or purposes for sound). **SUF 70; SUF Ex. 4-5**. The denial of the variance with all these restrictions prohibits virtually all meaningful use of the lights because they cannot be used at illumination levels sufficient to safely play competitive sports at night. **SUF ¶ 181.** This is despite the fact that granting the variance would have been a reasonable and superior exercise of the City's police power, resulting in an improved situation for both Vianney and the adjacent residences. **SUF 76**.

Finally, in its memorandum in support of its motion for summary judgment on Count II, the City attempts to equate the situation at hand to the situation in *City of Kansas City v. Tayler*, 689 S.W.2d 645 (Mo. Ct. App. 1985). In *Tayler*, the court found that a City ordinance requiring the defendant to keep his horse 200 feet from other residences did not constitute a taking by the City. *Id.* at 646-647. The City in *Tayler*, however, did not deprive the defendant of meaningful use of his property and his horse. *Tayler* was also just a "run of the mill" type of zoning regulation enforcement action, not the twisted and unique set of events in the instant case.

Here, the City deprived Vianney of the use of the lights and sound system after having induced Vianney to purchase and install them with repeated assurances that the lights were approved, placed additional restrictions in excess of restrictions found in the lighting regulations and sound regulations as part of the site plan approval, and then unanimously denied Vianney's application for a variance, all of which deprived Vianney of all meaningful use of the lights on the Sports Field Property because the lights cannot be used for the safe play of competitive sports at night—their intended purpose. **SUF ¶ 208.**

The deprivation letter, the imposition of the site plan conditions on Vianney's otherwise permitted use of the Sports Field Property, and the denial of the variance constitute an inverse condemnation of the lights and the sound system as Vianney's otherwise permitted use of the lights and the sound system is now severely limited, restricted and practically worthless. Not only is the value of the lights and sound system dramatically impacted, but other valuable compensable uses such as for school promotional activities, trades with other school to accommodate schedules, and grade school use for some leasing income for field markup costs are all prohibited. The foregoing actions taken by the City were an unreasonable use of its police power.

## CONCLUSION

Plaintiff respectfully requests this Court to DENY Defendant's Cross Motion for Summary Judgement and instead, GRANT its Motion for Partial Summary Judgment on Counts II, III, VI and VI and set a trial on the scope of injunctive relief and damages.

Respectfully submitted,

**Dalton & Tomich, PLC**

By:  /s/ *Daniel P. Dalton*
Daniel P. Dalton (admitted *Pro Hac* Vice)
Mich. Bar No. P 44056
The Chrysler House
719 Griswold Street, Suite 270
Detroit, Michigan 48226
313.859.6000
ddalton@daltontomich.com

and

**Jenkins & Kling, P.C.**

By:  /s/ Stephen L. Kling, Jr.
Stephen L. Kling, Jr. #29250
Michael P. Stephens #37491
Sally M. Sinclair #66229
150 North Meramec Avenue, Suite 400
St. Louis, MO 63105

(314) 721-2525 ph.
(314) 721-5525 fax
skling@jenkinskling.com
mstephens@jenkinskling.com
ssinclair@jenkinskling.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2018 the foregoing **Plaintiff's Memorandum in response to Defendants Response and Cross Motion for Partial Summary Judgment** was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Daniel P. Dalton*
Daniel P. Dalton