**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIANIST PROVINCE OF THE UNITED STATES, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:17-cv-805-RLW |
| v. | ) ) | Hon. Ronnie L. White |
| CITY OF KIRKWOOD, et al., | ) ) | |
| Defendant. | ) ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF**
**UNCONTROVERTED MATERIAL FACTS AND**
**ADDITIONAL UNCONTROVERTED FACTS**

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7-4.01(E), Defendants respond to Plaintiffs' Statement of Facts, indicating for the Court which facts are undisputed, undisputed but immaterial, unsupported by the evidence Plaintiffs cite and therefore should be disregarded, or disputed by other record evidence.[1]

Although Plaintiffs represented that "the following statement of uncontroverted facts filed with the original Motion for Summary Judgment is numbered One through One Hundred Fifteen. See **Dkt. 58**", Plaintiffs **materially altered** their previous Statements of Facts ¶¶ 3 and 5 (and immaterially altered ¶ 17) in an apparent effort to cover up their previous misrepresentation to this Court that athletics was a central tenet of the Marianist faith.  While these continued misstatements

---

[1] All documents and evidence referred to herein as "Exhibit ##" are attached to Defendants' Statement of Undisputed Material Facts, or, for Exhibits 49–60, are attached hereto.  Documents referred to as "Pls.' Ex. ##" are those exhibits attached to Plaintiffs' Statement of Undisputed Material Facts or Statement of Additional Uncontroverted Facts.

to the Court are inexcusable, Defendants will respond to the three altered paragraphs as well as

Plaintiffs' additional statements of fact.

### Response to Plaintiffs' Materially Altered Statements of Fact

3.       A core belief of the Marianist tradition is fellowship through education. ***Ex. 1*** ¶ 3.

**RESPONSE: Undisputed.  Defendants further acknowledge that athletics are *not* included as a core belief of the Marianist tradition, as Plaintiffs previously and falsely claimed in their original Statement of Uncontroverted Material Facts.**

5.       The Society of Mary, through serious research, consultation, and discussion involving lay and religious educators who work in Marianist educational ministries throughout the world, has developed five educational characteristics it pledges to uphold and promote in its institutions. The five characteristics are:

a.   **Educate for formation in faith.** Marianist schools help students to bear witness with a personal and committed faith that touches the heart. They will help promote a faith-and-culture dialogue and form students in the gospel's values and Christian attitudes. In addition, Marianist schools will pledge to educate in a free and responsible style, which elicits a personal response to faith, and they will make present the example and influence of Mary as the first disciple.

b.   **Provide an integral, quality education.** Marianist schools promote quality education of the whole person, providing a coherent curriculum and a well- formed professional staff and administration equipped with adequate supplies and finances. Marianist schools develop respect for the dignity of the person who has interior spirit and self-knowledge. In addition, Marianist schools develop in the students a concern for global and local issues of culture, ecology, and technology and they will foster a diverse faculty, staff, and student body while continuing to offer Mary as a model of integrity in relation to the realities of the world.

c.   **Educate in family spirit.** Marianist schools create a favorable environment for education by helping to cultivate interpersonal relationships characterized by openness, respect, integrity, and dialogue. They form an educational community characterized by collaborative structures and processes and one, which expresses authority as a loving and dedicated service. In addition, Marianist schools will influence others by exhibiting the Marian traits of openness, hospitality, graciousness and faith.

d.   **Educate for service, justice, and peace.** Marianist schools promote a missionary spirit and educate for solidarity as well as justice and peace. They attend to the poor, promote the dignity and rights of women, encourage the formation of Christian service groups,

announce justice and denounce oppression.

e. **Educate for adaptation and change.** Marianist schools will educate to shape the future. They educate students to accept and respect differences in a pluralistic society by helping them develop critical thinking skills and by teaching them to be open and adaptable to local and global contexts through enculturation and interdisciplinary education. Finally, Marianist schools embrace Mary's fiat, "Do whatever he tells you", allowing them to be available to responding to the signs of the times in faith.

*Exhibit 3*, Marianist Heritage webpage.

**RESPONSE: Undisputed. Defendants further acknowledge that athletics are *not* part of, or even mentioned in, the five characteristics of a Marianist education, as Plaintiffs previously and falsely claimed in their original Statement of Uncontroverted Material Facts.**

17. Approximately 100 Vianney student athletes participate in the soccer program. *Ex.*

*1* ¶ 14.

**RESPONSE:   Disputed, but immaterial, as the cited affidavit states that "[a]pproximately *80* Vianney student athletes participate in the soccer program."  (Pls.' Ex. 1, ¶ 14.) Immaterial.**


### Response to Plaintiffs' Additional Uncontroverted Facts

116. Vianney, like many other schools that opened in the St. Louis area 50 years ago, offered a limited number of athletic programs based on the availability of athletic fields. Exhibit 30, Stock, Dep. p. 38 (lines 3-25), 39 (lines 1-12).

**RESPONSE:   Disputed, but immaterial.  The cited testimony does not support the assertion that Vianney offered a limited number of athletic programs "*based on*" the availability of athletic fields.  (Pls.' Ex. 31, 38:3–39:12.)  Rather, the testimony indicates only that Vianney's sports program has grown since the time Vianney first opened.  (*Id.*)  Regardless, the size of Vianney's sports program is immaterial to any issue in this case.**

117. In 2012, Vianney evaluated their existing athletic fields in light of current needs, standards, and the requests of students and engaged Stock & Associates to help create a master plan for renovated athletic fields.  Exhibit 31, Stock, Dep. p. 38 (lines 3-25), 39 (lines 1-12).

**RESPONSE:   Disputed, but immaterial.  The cited testimony does not discuss at all the "current needs, standards and the requests of students" (Pls.' Ex. 31, 38:3–39:12), although Plaintiffs' unsupported addition is immaterial to any issue in this case.  Defendants do not dispute that Vianney engaged Stock & Associates to create a master plan for its sports facilities.**

118.    The religious mission of the school was not discussed with the contractors as they dealt solely with the fields.   Exhibit 31, Stock, Dep. p. 63 (lines 14-18); 186 (lines 20-25) 187 (lines 1-3).  *Exhibit 32*, Loyet deposition re.  religious mission of school: p. 51 (line 15-18), p. 52 (lines 1-3); p. 56  (15-19); p. 59 (11-25), p. 60 (lines 1-8), p. 87 (18- 22).

**RESPONSE:   Disputed in part.  Defendants do not dispute that Vianney failed to tell any of its contractors (or even Vianney's own CFO) that any of the field renovations, including the lights, were necessary to fulfill the school's "religious mission."  (Exhibit 22, Buening Dep. 18:24–19:2, 25:11–14; Exhibit 21, Stock Dep. 36:6–12, 109:3–7, 177:9–14; Exhibit 23, Stych Dep. 34:3–13; Exhibit 2, De Phillips Dep. 47:13–16, 49:3–9.)  However, none of the testimony Plaintiffs cite indicates *why* Vianney did not communicate its "religious mission" to its contractors as Plaintiffs incorrectly suggest.  Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶ 45.**

119.    Stock & Associates reviewed the City of Kirkwood's zoning and ordinance requirements in 2012.  *Exhibit 31*, Stock, Dep. p. 41 (lines 8-25), 42 (lines 1-19)

**RESPONSE:   Disputed, but immaterial.  The cited testimony indicates that George Stock met with certain City Officials to go over concept plans, not to review all of the City of Kirkwood's zoning and ordinance requirements.  (Pls.' Ex. 31, 41:8–42:19.)  Regardless, this statement of fact is immaterial to any issue in this case.**

120.    Through the 2012 master plan process, Stock & Associates discovered that the City had no limitation on athletic field lighting other than limiting the height of the poles which held the lights to 80 feet.  *Exhibit 31*, Stock, Dep. p. 45 (lines 6-8).

**RESPONSE: Disputed.   George Stock testified that he knew that Kirkwood had illumination requirements in 2012, but he did not include them in the email summarizing his 2012 meeting with the City of Kirkwood because he "wasn't designing lights."  (Pls.' Ex. 31, 45:9–18.)  The illumination requirements were added to Kirkwood's Zoning Code in November 2012 (Exhibit 5, Bensing Dep. 28:20–21;  Exhibit 6, KWD_004092–277, at KWD_004092, KWD_004264–65), prior to George Stock's December 14, 2012 meeting with**

the City Officials to review certain concept plans.  (**Exhibit 49**, Dep. Ex. 96.)  **Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶ 9.**

121.    Vianney selected a contractor for the Sports Field Property who had the responsibility of securing permits.  *Exhibit 31*, Stock, Dep. p. 44 (lines 19-22), 50 (lines 11- 13).

**RESPONSE:   Undisputed, but immaterial.**

122.    The proposed Sports Field Property included a turf field and lighting so that Vianney could use the field for baseball as well as lacrosse, soccer and ultimate Frisbee.  *Exhibit 32*, Loyet, Dep. p. 23 (lines 17-23).

**RESPONSE:   Disputed in part.  First, the cited testimony does not support *any* part of this statement of fact except that the following activities are performed on the north field: "baseball, soccer, lacrosse, and a variety of other activities."  (Exhibit 60, Loyet Dep. 23:17–23.)  Therefore, Defendants object to the unsupported portions of this statement of object. *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at *2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  Despite the fact that Plaintiffs have failed to properly support this statement of fact, as required under the Federal and Local Rules, Defendants do not dispute that as part of the north field's renovations, the field was turfed and lighting was added, nor do Defendants dispute that the field *continues* to be used for baseball, lacrosse, soccer, and ultimate Frisbee.  Defendants do dispute any suggestion that without the turfing or lighting, the north field could not be used for such activities.  (Exhibit 3, Dep. Ex. 54, at 3–4; Exhibit 2, De Phillips Dep. 13:11–14:5, 14:15–17, 15:12–17; Exhibit 1, Loyet Dep. 85:18–86:1, 108:24–109:3.)  Defendants further dispute that lighting was essential to the proposed renovations to the north field, as the renovations were announced without mentioning lights, and Vianney chose to move forward with the project regardless of whether it could have lights on the field.  (Exhibit 2, De Phillips Dep. 40:23–41:1, 83:16–20; *see also* Exhibit 13, VIANNEY 003249–51, at VIANNEY 003250 (voting to approve the renovations of the north field and stating that if funds were needed for soil stabilization, the funds earmarked for the lights would be used); Exhibit 1, Loyet Dep. 274:15–21; Exhibit 14, Dep. Ex. 40.)  Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶ 17.**

123.    Being able to offer additional sports on the lighted Sports Field Property aligns with Vianney's religious mission of giving students more opportunities to grow in the faith. *Exhibit 32*,

Loyet, Dep. p. 51 (lines 15-22), p. 52 (lines 1-3); p. 56 (lines 11-24); p. 59 (lines 15-25), p. 60 (lines 1-8); p. 85, (lines 1-25); p. 87 (lines 18-22).

**RESPONSE: Disputed. The Characteristics of Marianist Education, published by the Marianist Province of the United States, never even mention athletics or sports. (Exhibit 35, The Marianists, *Characteristics of Marianist Education*, https://www.marianist.com/wp-content/uploads/2017/10/CME_09012016.pdf (hereinafter "Characteristics of Marianist Education").) Additionally, Vianney's "Marianist Heritage" page does not once mention athletics or sports. (Pls.' Ex. 3; *see also* Defs.' Resp. to Pls. SUMF ¶ 5.) Indeed, when asked whether Vianney needed the full, requested lighting level (70/50) to "fulfill [Vianney's] religious mission," Vianney's CFO responded: "Well, I don't know if that's true. I, I don't know if that's the level that says you have to have that level to fulfill your religious -- no, that's, that's *ridiculous*." (Exhibit 2, De Phillips Dep. 85:16–21 (emphasis added).) Vianney even decided to move forward with its plans to renovate the sports field *knowing* that lights may not be permitted. (Exhibit 2, De Phillips Dep. 36:23–37:2, 39:2–11, 44:21–45:23, 83:16–20; *see also* Exhibit 13, VIANNEY 003249–51, at VIANNEY 003250 (voting to approve the renovations of the north field and stating that if funds were needed for soil stabilization, the funds earmarked for the lights would be used); Exhibit 1, Loyet Dep. 136:21–137:1, 178:1–8, 274:15–21.)**

124.   In April 2015, Stock & Associates prepared a lighting plan for the baseball field.

*Exhibit 31*, Stock, Dep. p. 58 (lines 10-25), 59 (lines 1-13).

**RESPONSE: Disputed, but immaterial. Stock & Associates never prepared a lighting plan—Musco prepared the various photometric plans—nor does the cited testimony indicate that Stock & Associates ever prepared a lighting plan. (Pls.' Ex. 31, 58:10–59:13; *see also* Exhibit 50, Stock Dep. 85:13–16, 134:13–20.)**

125.   Stock & Associates worked with Musco Lighting, the leading light supplier for athletic stadiums across the United States, to select the lights to be used on the baseball field and develop a photometric plan.  Exhibit 31, Stock, Dep. p. 62 (lines 4-12); http://www.musco.com.

**RESPONSE: Though immaterial, Defendants object because the cited testimony does not support this statement of fact at all and the referenced website is inadmissible, unauthenticated hearsay that cannot be relied upon by the Court. *Allied Prop. & Cas. Ins. Co. v. Stuart*, 230 F. Supp. 3d 969, 980 n.1 (E.D. Mo. 2017) (emphasis added) ("[U]nauthenticated website printouts attached as exhibits to summary judgment motions or responses *are not admissible*."); *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (holding that "[a]t summary judgment, the requisite 'genuine dispute,' Fed.R.Civ.P. 56(a), must appear in *admissible* evidence" and finding that newspaper articles**

were "rank hearsay" that could not be considered).  **This statement of fact should be stricken as unsupported by the record.  Further, it is immaterial.**

126.    A photometric plan is a plan that shows the "brightness" of lights as well as "light spillage" on adjacent property.   https://bit.ly/2Ej2phn

**RESPONSE: Defendants object because the referenced website is inadmissible, unauthenticated hearsay that cannot be relied upon by the Court.** *Allied Prop. & Cas. Ins. Co. v. Stuart*, **230 F. Supp. 3d 969, 980 n.1 (E.D. Mo. 2017) (emphasis added) ("[U]nauthenticated website printouts attached as exhibits to summary judgment motions or responses** *are not admissible.***");** *Crews v. Monarch Fire Prot. Dist.*, **771 F.3d 1085, 1092 (8th Cir. 2014) (holding that "[a]t summary judgment, the requisite 'genuine dispute,' Fed.R.Civ.P. 56(a), must appear in** *admissible* **evidence" and finding that newspaper articles were "rank hearsay" that could not be considered).  This statement of fact should be stricken as unsupported by the record.**

127.    Todd Stych, the representative from Musco assigned to the project, noted that there is nothing unique about the Sports Field Property, it is like all others.  *Exhibit 34*, Stych Dep. p. 142 (lines (15-19).

**RESPONSE:  Disputed.  Mr. Stych** *actually* **testified that all the baseball fields he has worked on are different sizes.  (Exhibit 51, Stych Dep. 142:15–19.)  He also testified that he does not recall working on any other baseball field project where the field was as close to residences as Vianney's baseball field was to its neighboring residents.  (***Id.* **99:20–23.)**

128.    On April 24, 2015, representatives from Stock & Associates received a voicemail from Ryan Spencer, City Planner of the City of Kirkwood, in response to an inquiry about the proposed lighting at the Sports Field Property.  *Exhibit 31*, Stock, Dep. p. 76 (lines 10-25) 77 (lines 1-10).

**RESPONSE:   Undisputed, but immaterial.**

129.    On April 24, 2015, Mr. Spencer advised Stock & Associates that the City added a lighting element to its code which limits the offsite light spillage to a maximum foot candle of .1, measured on the ground at the property line.  *Exhibit 31*, Stock, Dep. p. 77 (lines 9-10).

**RESPONSE:   Disputed in part.  Notably, the testimony that Plaintiffs cited states, _in full_, "Do you see that? I do."  (Pls.' Ex. 31, 77:9–10.)  So, this statement of fact is unsupported by the referenced testimony and should be disregarded and stricken as wholly unsupported.  _Wenzel v. City of Bourbon_, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  Further, Defendants dispute the suggestion that "a lighting element [was added] to its code" during this time—as the Lighting Regulations had been adopted three years prior in November 2012. (Exhibit 5, Bensing Dep. 28:20–21; Exhibit 6, KWD_004092–277, at KWD_004092, KWD_004264–65.)  Defendants further dispute the suggestion that Stock & Associates was not aware of such lighting requirements prior to Mr. Spencer's April 24, 2015 voicemail.  (_See_ Exhibit 50, Stock Dep. 45:9–18 (testifying that he (George Stock) knew that Kirkwood had illumination requirements _in 2012_).)**

130.    Jacob Buening, a civil engineer for Stock & Associates assigned as the project manager for the Sports Field Property, testified that the Kirkwood lighting restriction is one of the most restrictive lighting ordinances in the United States with which he is familiar.  _Exhibit 33_, Buening Dep. p. 5 (line 1), 6 (lines 19-21), 44 (lines 7-11).

**RESPONSE:   Disputed.  When asked how Kirkwood's Lighting Regulations compared to other cities, Mr. Buening responded, "_Gosh, I couldn't say.  I don't memorize the various different cities' requirements.  I know they all have requirements, but I couldn't say how they compared to other cities_."  (Exhibit 52, Buening Dep. 44:1–6 (emphasis added).)  Despite Mr. Buening's testimony that he lacked personal knowledge to make a comparison of various Codes, Plaintiffs' counsel asked him to speculate, so he responded, "I would _think_ theirs is _probably_ on the restrictive side." (_Id._ 44:7–11 (emphasis added).)  He never testified that the Kirkwood Lighting Regulations are "one of the most restrictive lighting ordinances in the United States."  This is another example of Plaintiffs' unacceptable misstatements of the record, and this statement of fact, lacking any support either from the cited testimony, or the record as a whole, should be stricken. _Wenzel v. City of Bourbon_, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  The truth is that, even if only other Missouri municipalities are considered, such municipalities utilize the .1 fc restriction next to residential homes _or do not permit any light trespass whatsoever._ (Exhibit 10, Frontenac Code of Ordinances § 527.050 ("_Illumination from light trespass shall not exceed one-tenth (0.1) foot-candles as measured at the property line for adjacent residential property_ or one-half (0.5) foot-candles as measured at the property line for adjacent non-residential property."); Exhibit 11, City of Creve Coeur Code of Ordinances § 405.680(B)(4) (permitting _no_ light trespass: "Lighting shall not be cast upon an adjacent property or right-of-way nor shall glare be emitted from an illuminant source.").)**

131.    Stock & Associates then called Musco Lighting, the lighting engineer, and asked if they could prepare a plan that allows for a safe and usable playing field at Vianney which could comply with the .1-foot candle issue.  *Exhibit 31*, Stock, Dep. p. 84 (lines 1- 25), p. 85 (lines 1-16).

**RESPONSE:   Undisputed, but immaterial.**

132.    When asked by Stock & Associates if Musco could reduce the adjacent light spillage, Musco responded that it could not provide a photometric plan that complied with the City of Kirkwood Lighting Ordinance and meet the engineering and safety standards to play baseball, lacrosse, or soccer.  *Exhibit 31*, Stock, Dep. p. 86 (lines 9-13); *Exhibit 34*, Stych Dep. p. 69 (lines 11-25), p. 70 (lines 1-23).

**RESPONSE:   Undisputed.**

133.    Therefore, Stock recommended to Vianney that it apply for a lighting variance before the City of Kirkwood Board of Adjustment.  *Exhibit 31*, Stock, Dep. p. 94 (lines 2-9).

**RESPONSE:   Undisputed.  Stock also opined that, "Based on the impacted properties [he] cannot imagine [Vianney] would ever get a variance" and discussed his opinion with Mr. Loyet.  (Exhibit 50, Stock Dep. 93:17–94:9.)  Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶ 24.**

134.    The Vianney application for a lighting variance is very clear: the photometric plan showing the light spillage off of the Vianney property, sought a variance for "new lighting," not "replacement of lighting."  *Exhibit 31*, Stock,  Dep. p. 118  (lines 16-25), p. 119  (lines 1-4); *Exhibit 35*.

**RESPONSE:   Disputed in part.  It is undisputed that the June 2015 variance application disclosed that it sought a variance for new lighting, but there is no indication that it is not for "replacement of lighting."  (See Exhibit 16, Dep. Ex. 42.)  Further, it is immaterial.**

135.    Vianney moved forward with designing the Sport Field Property with outdoor lights while at the same time, applied for a lighting variance.  *Exhibit 33*, Buening Dep. p. 18 (lines 16-19).

**RESPONSE:  Disputed.  The cited testimony does not support the proposition that "Vianney moved forward with designing the Sport Field Property <u>with outdoor lights</u> while at the same time, applied for a lighting variance."  Mr. Buening merely testified that the north field was going to be renovated *whether or not Vianney could put lights on the field*, demonstrating that Vianney did not consider the lights essential to its "religious mission" at that point in time.  (<u>Exhibit 52</u>, Buening Dep. 18:11–19:2.)  Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶¶ 18–20.**

136.    Ryan Spencer, the city planner assigned to Vianney's lighting variance request, was charged with reviewing the photometric plan based on the variance request for lighting sought by Vianney.  *Exhibit 36*, Spencer, page 28 (lines 12-25), p. 29 (lines 1- 17).

**RESPONSE:   Undisputed, but immaterial.  Defendants further object because the cited testimony does not support this statement of fact, which can and should be disregarded for failure to comply with E.D. Mo. Local Rule 7 – 4.01(E).  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").**

137.    Spencer reviewed Vianney's lighting variance application in his office.  *Exhibit 36*, Spencer, p. 31 (lines 5-25), p. 32 (lines 1-13), p. 79 (lines 20-25).

**RESPONSE:   Disputed in part, but immaterial.  The cited testimony indicates *what* Mr. Spencer reviewed, but not *where* he was when he reviewed it.  Regardless, the location of Mr. Spencer's review of Vianney's variance application is totally irrelevant and immaterial.**

138.    Spencer did not drive over to Vianney to see if it had lights on the Sports Field Property.  *Exhibit 36*, Spencer, page 36 (lines 13-16).

**RESPONSE:   Undisputed that Spencer did not drive to Vianney to see if it had lights on the north sports field property at the time he reviewed Vianney's variance application in June 2015, but immaterial.**

139.    Spencer reviewed the site by comparing four separate aerial views found on and concluded the Vianney baseball field had lights on it. *Exhibit 36*, Spencer, p. 31 (lines 11-25), p. 32 (lines 1-13), p. 79 (lines 17-25).

**RESPONSE:  Disputed in part, but immaterial. Mr. Spencer did not testify that he compared *four* separate aerial views (Exhibit 53, Spencer Dep. 32:8–18), but did testify that he had a phone conversation with somebody representing Vianney, which gave him "the impression there were lights" already on the north field; additionally, his review of certain aerials (he did not recall which aerials) also gave him the impression there were already lights on the north field. (*Id.* 28:12–29:1.)**

140.    Based on his research, Spencer concluded that Vianney did not require a lighting variance for the baseball field because it already [sic] lights on the field and replacing the existing lights did not require a variance. *Exhibit 36*, Spencer, p. 31 (lines 11-25), p. 32 (lines 1-13), p. 79 (lines 17-25).

**RESPONSE:   Undisputed.**

141.    Prior to contacting Vianney, Spencer called the City Attorney and told him what he discovered and the conclusion he reached. *Exhibit 36*, Spencer, p. 43 (lines 6-17).

**RESPONSE:   Undisputed, but immaterial.**

142.    Spencer testified that he did not recall receiving any direction from the City Attorney in response to his inquiry about lights on the Sports Athletic Field. *Exhibit 36*, Spencer, p. 153 (lines 13-23).

**RESPONSE:   Disputed in part based on the lack of clarity of this purported statement of fact.  Specifically, it is unclear what "inquiry" Plaintiffs are referencing.  Mr. Spencer never testified that he made an *inquiry* to the City Attorney about the lights on Vianney's north sports field.  Rather, Mr. Spencer testified (many times) that *he told* City Attorney Hessel there were lights previously on the field.  (Exhibit 53, Spencer Dep. 29:2–4, 43:6–14, 87:13–88:12.)  Regardless, this statement of fact is immaterial.**

143.     It was believed that the City Attorney was familiar with the Sports Field Property and knew whether lights were on the field or not, as his son went to Vianney and played baseball on the Sports Field Property several years before the call occurred.  *Exhibit 31*, Stock, Dep. p. 142 (lines 3-15).

**RESPONSE:   Disputed.   This statement of fact is, on its face, pure speculation ("[i]t was believed") as City Attorney Hessel is not a witness in this case and has provided no sworn testimony.   As such, Mr. Stock's speculative testimony is inadmissible and must be disregarded.  *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (holding that "[a]t summary judgment, the requisite 'genuine dispute,' Fed.R.Civ.P. 56(a), must appear in *admissible* evidence").   In fact, Mr. Stock even testified he lacked personal knowledge on the subject, testifying: "Well, I didn't even know your son went to Vianney unless I was informed that by somebody at Vianney that your son went there." (Exhibit 50, Stock Dep. 141:16–18.)   Plaintiffs' citation is speculation based on hearsay and clearly inadmissible.   However, even this inadmissible, speculative, hearsay testimony indicates that Mr. Hessel's son played baseball at Vianney *over twenty years ago*, not "several." (*Id.* 142:3– 15.) Thus, such speculation regarding the City Attorney's knowledge of the field based on hearsay testimony that his son played on the field over twenty years ago is baseless and untrue given the passage of time.   Regardless, this statement of fact is immaterial.**

144.     After his call to the City Attorney, Spencer called Jacob Buening from Stock & Associates and told him that Vianney did not need a lighting.   *Exhibit 38*, Buening dep. p. 26 (lines 9-13); *Exhibit 37*, Spencer, p. 28 (lines 12-25) p. 29 (lines 1-21).

**RESPONSE:   Disputed in part due to Plaintiffs' apparent failure to finish their sentence. Defendants do not dispute that in June 2015, Mr. Spencer called Jacob Buening and told him that Vianney did not need a *variance* for the lighting on the north sports field, which was later determined to be incorrect.  (Exhibit 53, Spencer Dep. 28:12–29:21.)  Defendants do not dispute that Vianney does *not* need lighting on its north sports field, although there is no evidence that Mr. Spencer told Vianney as much.**

145.     Mr. Buening called Spencer back and asked for the email to confirm his decision. *Exhibit 38*, Buening Dep. p. 31 (lines 2-9); *Exhibit 31*, Stock, Dep. p. 116 (lines 7-10).

**RESPONSE:   Undisputed, but immaterial.**

146.    Spencer agreed and sent the following email to Buening: "Jacob, Please accept this email as official record.  The City of Kirkwood has determined that the proposed variance is not required as the a (sic) currently, non-conforming situation is being made less non-conforming. Please proceed forward with the project.  Regards, Ryan Spencer, AICP."  *Exhibit 39* (Emphasis added).

**RESPONSE:   Undisputed.**

147.    Spencer intended for Vianney to rely on his email as he wrote, "Please accept this email as official record." *Exhibit 36*, Spencer, p. 94 (lines 1-14).

**RESPONSE:   Undisputed, but immaterial.**

148.    George Stock, of Stock & Associates, testified that he reasonably relied on Spencer's email to proceed with the project. *Exhibit 31*, Stock, Dep. p. 186 (lines 8-17).

**RESPONSE:  Disputed.   Defendants dispute that Stock and Associates' or Vianney's reliance was reasonable, when Mr. Stock, Mr. Buening, Mr. Stych, Mr. Loyet, and Mr. De Phillips all testified they had <u>no idea</u> what Mr. Spencer's decision meant, but decided to move forward with the project anyway, without seeking any clarification from the City.  (<u>Exhibit 1</u>, Loyet Dep. 189:16–19, 190:15–18; <u>Exhibit 2</u>, De Phillips Dep. 54:4–9, 54:12–55:18; <u>Exhibit 21</u>, Stock Dep. 116:11–14, 118:10–12, 122:14–25; <u>Exhibit 22</u>, Buening Dep. 26:9–20, 31:12–20; <u>Exhibit 23</u>, Stych Dep. 138:20–24.)  It would be up to a factfinder to determine whether Vianney's decision to blindly move forward without inquiring as to what the "currently non-conforming situation" meant was reasonable, *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 161 (Mo. Ct. App. 2000) ("Whether her reliance was reasonable or not is a question of fact."), but it is immaterial for purposes of summary judgment in favor of Defendants.  Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶ 29.**

149.    Buening testified that when the City told him that of Stock & Associates could move ahead with the lighting, they did so because the City is the authority on the issue. *Exhibit 33*, Buening Dep. p. 51 (lines 17-23).

**RESPONSE:   Undisputed, but immaterial.**

13

150.    Buening testified that when they get municipal approval for a project they have no reason to question it.  *Exhibit 33*, Buening Dep. p. 62 (lines 19-21).

**RESPONSE:   Undisputed that Mr. Buening testified he would not question an approval *even if the City Official said he was approving the building permit because he had waffles* (in other words, even if the cited reason clearly violated the Code):**

> **Q    If you received, for example, like the hypothetical I just posed, "You can proceed forward with this project.  I'm approving the building permit because I had waffles this morning and so I'm in a good mood," would you proceed forward with that project?**
> **MS. SINCLAIR:  Objection.  Form and foundation.**
> **Q    (By Ms. Milunski) Without further clarification?**
> **A    It wouldn't make much sense for it to be stated that way.  But if they are issuing an approval, there would be no reason to question that.**

**(Exhibit 52, Buening Dep. 62:9–21.)**

151.    No one on the Vianney team evaluated the first sentence of the Spencer email as they were pleased with the conclusion that the city now allowed it to install lights on the field.  *Exhibit 31*, Stock, Dep. p. 123 (lines 1-10); p. 124 (lines 21-25), p. 125 (1- 25), p. 127 (9-23).

**RESPONSE:   Undisputed.**

152.    Todd Stych of Musco Lighting testified that he read the Spencer email, did not know what the first sentence of his email meant, but that they could proceed with the construction.  *Exhibit 34*, Stych Dep. p.138 (lines 6-24) p. 141 (lines 23-25) p. 142 (lines 1-2).

**RESPONSE:   Undisputed.**

153.    Musco and Vianney moved forward with a purchase order for the lighting after receiving the Spencer email.  *Exhibit 32*, Loyet Dep. p. 235 (lines 1-10).

**RESPONSE:   Undisputed.**

154.    Vianney purchased and installed lights for the Sports Field Property at a cost of no

less than $235,000.  *Exhibit 40*.

**RESPONSE:   Disputed.  Defendants dispute the cost to purchase and install the lights was in excess of $235,000.  (Exhibit 45, KWD_002627–28; Exhibit 46, VIANNEY001324–30, at VIANNEY001330 ($83,415 + $142,500 = $225,915).)  Plaintiffs' Exhibit 40 (the only exhibit purporting to support this statement of fact) demonstrates that the total cost to purchase the lights was $142,500.**

155.    Vianney submitted a full blown photometric plan to the City in August 2015.

*Exhibit 41*.

**RESPONSE:   Disputed. Defendants object because the cited exhibit does not support the proposition.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at *2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  The date on the cited exhibit is illegible—indeed, in their original Statement of Facts ¶ 44, Plaintiffs cited this same exhibit to show that Vianney submitted the 2015 Lighting Plain in *October* 2015.  They now claim it shows it was submitted in *August* 2015.  However, the cited exhibit fails to show the lighting plan was submitted on either date because the date is illegible, and Wendell De Phillips testified that the "2015 Lighting Plan" was *not* submitted in October 2015, when Vianney (belatedly) applied for a building permit. (Exhibit 2, De Phillips Dep. 32:4–17; *see also* Exhibit 43, Feb. 5, 2016 Email.)**

156.    The City then reviewed the plan and eventually issued a building permit for the

dugouts and light standards.  Exhibit 42.

**RESPONSE:   Disputed in part.   Defendants dispute that the City "reviewed the [photometric] plan" in the fall of 2015 and incorporate their response to Plaintiffs' Statement of Additional Fact ¶ 155, demonstrating Plaintiffs did *not* submit a photometric plan for the City to review in the fall of 2015.  Defendants do not dispute that the City issued a building permit for the dugouts and light standards on October 15, 2015, "*subject to Planning & Zoning approval*" and requiring that "[a]ny additional requirements shall be met." (Exhibit 44, Dep. Ex. 52 (emphasis added).)  Notably, Plaintiffs had already substantially completed construction on the north field before they even applied for a building permit, in contravention of the City Code, and without obtaining site plan approval from the Planning and Zoning Commission.   (Exhibit 54, De Phillips Dep. 24:17–25:6; Exhibit 32, KWD_002200–18, at KWD_002201.)**

157.     In the fall of 2015, the City was alerted that construction of dugouts at the baseball field was occurring at Vianney without permits.  *Exhibit 37*, Schenck Dep. p. 68 (1-25), p. 69 (lines 1-10).

**RESPONSE:   Undisputed.**

158.     Ryan Spencer and Jack Schenck, the building commissioner for the City of Kirkwood, went to inspect the site in September 2015.  *Exhibit 37*, Schenck Dep. p. 68 (lines 1-6).

**RESPONSE:   Undisputed, but immaterial.**

159.     Ryan Spencer's first trip to Vianney occurred in September 2015.  *Exhibit 36*, Spencer, p. 36 (lines 17-25), p. 37 (lines 1-25).

**RESPONSE:   Undisputed, but immaterial.**

160.     Spencer did not look at lights when he went to inspect the site in September 2015.  *Exhibit 36*, Spencer, p. 38 (lines 12-16).

**RESPONSE:   Disputed, and immaterial.  Mr. Spencer testified that he could not recall whether the lights were up when he visited the Vianney site in the fall of 2015, not that he did not look at them.  (Pls.' Ex. 36, 38:12–13.)  Mr. Spencer also testified that the lights were not the focus of that visit, which was to inspect the substantial amount of construction work that was occurring at Vianney *without any permits, in violation of the Code*.  (Pls.' Ex. 36, 36:17–38:16; *see also* Pls.' Ex. 37, 68:1–69:3.)**

161.     Schenck recalled seeing at his first site visit to Vianney that the contractor was pouring concrete bases for the light poles as the lights were not up yet.  *Exhibit 37*, Schenck Dep. p. 70 (lines 19-25), p. 71 (lines 1-2).

**RESPONSE:   Undisputed, but immaterial.**

162.    Spencer told Schenck that Vianney was improving the field and upgrading the lighting- meaning they were replacing existing lighting. *Exhibit 37*, Schenck Dep. p. 73 (lines 1-19).

**RESPONSE:   Undisputed, but immaterial.  The City admits that a mistake was made in allowing Vianney to proceed with installation of lights.**

163.    Wendell DePhillips, Vianney's lead representative for the renovation project, learned from the City and its own lighting contractor that the general contractor the school hired to renovate the Sports Field Property was required to secure building permits prior to construction of the dugouts and the installation of the light poles, but did not. *Exhibit 43*, DePhillips Dep. p. 22-24, 27.

**RESPONSE:   Disputed in part.  Mr. De Phillips testified that he knew Vianney was required to obtain building permits prior to construction and the installation of the light poles. (Exhibit 54, De Phillips Dep. 26:6–9.)  Undisputed that Mr. De Phillips learned (several months after construction had begun) that its general contractor failed to secure building permits prior to construction of the north field.  (*Id.* 24:17–25:6, 26:10–17.)**

164.    In response to the visit from the City of Kirkwood inspectors, Vianney's contractor for the Sports Field Property submitted a site plan for the renovation of the Sports Field Property, which included a photometric plan, on October 14, 2015. *Exhibit 44*.

**RESPONSE:   Disputed.  The third page of Plaintiff's Exhibit 44 was *not* submitted as part of Vianney's site plan review application, only the first two pages were.  Notably, Vianney has not even attached the bates labeled versions of these documents, which would demonstrate that the third page was improperly added to Exhibit 44 to falsely suggest that it was included in the materials provided to the City in October 2015 as part of Vianney's Site Plan Review Application.  The bates labeled documents are as follows: the first two pages are VIANNEY001159–60 (which was Deposition Exhibit 100, attached hereto as Exhibit 55), and the third page, which was not part of Vianney's October submission to the City, is bates labeled KWD_002575, and was submitted as part of Vianney's prior June 2015 application for a variance.  (Exhibit 16, Dep. Ex. 42 at KWD_002575.)  Once again, Vianney is misrepresenting the record, as even its CFO testified that a photometric plan was *not* included in its submission to the City for a building permit and Site Plan Approval.  (Exhibit 2, De Phillips Dep. 32:4–17; *see also* Exhibit 43, Feb. 5, 2016 Email.)**

165.     The day following the site visit, the City had time to review the plan and then issued the building permit to install the lights and complete the field dugouts.  *Exhibit 42*.

**RESPONSE:   Disputed.  While Vianney does not define what "plan" the City allegedly had time to "review," and to the extent Vianney suggests that the City reviewed the photometric plan that Vianney did _not_ submit as part of its application for a building permit and site plan review, Defendants deny that it reviewed any such plan.  (Exhibit 55, Dep. Ex. 100; Exhibit 16, Dep. Ex. 42 at KWD_002575; Exhibit 2, De Phillips Dep. 32:4–17; Exhibit 43, Feb. 5, 2016 Email.)  While Defendants do not dispute that on October 15, 2015 a building permit was issued to Vianney, it does dispute that the building permit was any sort of approval of the site plan, as the building permit states "this permit issuance is *subject to Planning & Zoning approval.  Any additional requirements shall be met."  (Exhibit 44, Dep. Ex. 52 (emphasis added).)  Defendants further dispute that the Planning and Zoning Commission, which must approve a site plan before a building permit can be issued, had the opportunity to review Vianney's application before the building permit was issued.  Because Vianney had already substantially completed construction before it applied for a building permit, the normal review process (site plan review and approval, then issuance of a building permit, *then* construction) could not occur.  The City of Kirkwood was simply rescinding a stop work order to accommodate Vianney because the construction was substantially completed, but the City had no obligation to rescind the stop work order and could have refused to issue a building permit until Vianney obtained site plan approval from the Planning and Zoning Commission.**

166.     Mr. DePhillips went to Kirkwood City Hall to pick up the building permit.

*Exhibit 43*, DePhillips Dep. p. 23 (lines 1-13), p. 24  (lines 17-20); p. 27 (lines .

**RESPONSE:   Undisputed, but immaterial.**

167.     Mr. DePhillips met with Bill Bensing, the planning director for the City of Kirkwood, who spoke with the city attorney about the permits.  *Exhibit 43*, DePhillips Dep. p. 31 (lines 8-20).

**RESPONSE:   Disputed, but immaterial.  First, Defendants dispute that Bill Bensing is the "planning director for the City of Kirkwood"; he is the Director of Public Services.  (Exhibit 56, Bensing Dep. 8:25–9:1.)  Second, Defendants dispute that Mr. De Phillips met with Bill Bensing or that Mr. Bensing told Mr. De Phillips that he spoke with the City Attorney about the permits.  Mr. De Phillips *actually* testified that he spoke with an unknown city worker who indicated that the city worker "had talked with Mr. Hessel and I believe Bill Bensing and said it was okay to issue the permit."  (Exhibit 54, De Phillips Dep. 31:8–20.)  Of course,**

the statement by the unknown city worker is rank hearsay, which is inadmissible and cannot be considered. *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (holding that "[a]t summary judgment, the requisite 'genuine dispute,' Fed.R.Civ.P. 56(a), must appear in *admissible* evidence" and finding that newspaper articles were "rank hearsay" that could not be considered).

168.    Mr. DePhillips testified that he heard the City Attorney approve the issuance of the

building permits to the planning director and, as a result, the permit was issued so that the lights at

the Sports Field Property could be installed.  *Exhibit 43*, DePhillips Dep. p. 31 (lines 8-20).

**RESPONSE:   Disputed, but immaterial.   This is a gross misstatement of Mr. DePhillips' testimony.   Mr. DePhillips testimony does not indicate that either Mr. Hessel or Bill Bensing were even present when he got the building permit from some "city officials or city workers behind the counter."  (Pls.' Ex. 43, 31:8–20.)   Instead, he merely testified to the hearsay testimony of the unknown City worker who said he had a conversation with the City Attorney and *maybe* Bill Bensing.  (*Id.*)  *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (holding that "[a]t summary judgment, the requisite 'genuine dispute,' Fed.R.Civ.P. 56(a), must appear in *admissible* evidence" and finding that newspaper articles were "rank hearsay" that could not be considered).**

169.    Vianney's electric contractor installed the lights once the permit was issued.

*Exhibit 43*, DePhillips Dep. p. 27 (lines 14-17).

**RESPONSE:   Disputed.   Defendants object because the cited testimony does not support that Vianney's electric contractor installed the lights *only after the permit was issued*.  (Pls. Ex. 43, 27:14–17 ("Q And Schaeffer Electric was the contractor installing the lights and the conduit; is that correct? A Correct.").)  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at *2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").**

170.    On December 22, 2015, once the lights were installed at the baseball field, Musco

Lighting tested and found that the light spillage was 4.95-foot candles at the property line of the

adjacent property owners.  *Exhibit 34*, Stych Dep. p. 62 (lines 1-5).

**RESPONSE:   Disputed in part.   Defendants do not dispute that there was as much as 4.95 foot candles cast onto the neighboring residents' properties by Vianney's sports lights (almost *fifty* times the limit permitted by the Kirkwood Lighting Regulations).   Defendants**

do dispute that Musco came to Vianney and tested the sports lights on December 22, 2015, as Mr. Stych testified he took readings in February 2016.  (**Exhibit 51**, Stych Dep. 57:2–13.)

171.    At the December 22, 2015, a question was raised by one neighbor near the school about the lighting at the Sports Field Property.  *Exhibit 36*, Spencer, p. 133 (lines 7- 12).

**RESPONSE:   Disputed, but immaterial.  Defendants object and move that it be stricken because the statement is unclear as to what is meant by "At the December 22, 2015 . . ." and because the cited testimony does not support this statement of fact.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  The testimony Plaintiffs cite states in full: "Q.   Did anyone on the P & Z Commission ever come back to you after that meeting on February the 3rd and ask you about whether or not you had made a mistake?  A.   I don't recall any conversation like that."  (Pls.' Ex. 36, 133:7–12.)  Further, it is immaterial.**

172.    In February 2016, after the City investigated the question and found out that seven months earlier it had erred in concluding that the Sports Field Property had lights on it, the City concluded that the lights were new.  *Exhibit 36*, Spencer, page 133.

**RESPONSE:   Defendants object and move to strike this statement of fact because the cited testimony does not support this statement of fact whatsoever.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  The testimony Plaintiffs cite states in full:**

**foundation. [full question omitted from citation]**
**A.   Did I indicate to Vianney I had made a mistake?**
**Q.   (By Mr. Stephens)  Yes.**
**A.   I don't recall indicating to Vianney I had made a mistake.**
**Q.   Did anyone on the P & Z Commission ever come back to you after that meeting on February the 3rd and ask you about whether or not you had made a mistake?**
**A.   I don't recall any conversation like that.**
**Q.   And you had told Mr. Powell according to Exhibit 99 that the lighting would be to code, correct?**
**MS. MILUNSKI:  Asked and answered.**
**Q.   (By Mr. Stephens)  Page 1662 bate stamped.**
**A.   What was my response?  Am I allowed to ask what my response was?**
**Q.   Well, the text of the email --**

      **A.  You're asking the same question again. What was my response the first time?**
      **Q.  Well, I just want to lead up to the next question.  So the point is the email from**
**[remainder of question omitted]**

(Pls.' Ex. 36, 133:1–25.)

173.    On February 11, 2016, the City of Kirkwood, through its Planning Director Bill

Bensing, sent Vianney the "Deprivation letter" stating that Vianney could not use the lights or and

the sound system until the site plan had been approved and the lights until a site plan was approved

and the lights complied with Code.  ***Exhibit 45***.

**RESPONSE:  Disputed in part.  Defendants do not dispute that on February 11, 2016,
Director of Public Services Bill Bensing sent Vianney a letter stating that Vianney could not
use its sound system or lights, except for testing purposes, until the site plan review process
was complete.  As Planning and Zoning could not approve a site plan that violated the Zoning
Code (as only the Board of Adjustment has the authority to grant deviations from the Code),
Mr. Bensing requested that Vianney submit a revised lighting analysis that showed the
School's conformance with the Lighting Regulations.  (Pls.' Ex. 45.)  Defendants otherwise
dispute this statement of fact, including Mr. Bensing's incorrect title (Public Services
Director), the characterization of the letter as the "Deprivation letter," and Plaintiffs'
inaccurate summary of the letter.  (Pls.' Ex. 45.)  Further, it is immaterial.**

174.    On February 16, 2016, the City Attorney spoke with Mike Loyet, the President of

Vianney, and told him the City made a mistake in granting permission to the school to install lights

on the baseball field.  ***Exhibit 33***, Buening Dep. p. 38 (lines 22-25), p. 39 (lines 1-2).

**RESPONSE:   Undisputed, although Defendants object because the cited testimony is based
upon inadmissible hearsay.  *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir.
2014) (holding that "[a]t summary judgment, the requisite 'genuine dispute,' Fed.R.Civ.P.
56(a), must appear in *admissible* evidence" and finding that newspaper articles were "rank
hearsay" that could not be considered).  Indeed, the cited testimony involves multiple layers
of hearsay (as it involves an email (hearsay) recounting a conversation between the City
Attorney and Mike Loyet (hearsay)).  Further, it is immaterial.**

175.    Subsequent letters from the City informed Vianney that they could not rent out the

facility until it received approval from the City.  ***Exhibit 38***, Bensing Dep. p. 124 (lines 12-25),

p. 125 (lines 1-24); ***Exhibit 46***.

**RESPONSE: Disputed.   The November 10, 2016 letter (Plaintiff's Exhibit 46) was withdrawn by the City, making it wholly irrelevant.  (Exhibit 57, Dep. Ex. 87.)  As the retraction explicitly stated, Vianney *could* rent out its property with*out* further approval of the City as long as the rental was limited to situations that were accessory uses to Vianney's permitted use as a school.  (*Id.*)  Further, it is immaterial.**

176.    In his 30-year career as the City Planning Director for the City of Kirkwood, Bill Bensing never had a situation where a staff error resulted in the retraction of an approval as in this case.  *Exhibit 38*, Bensing Dep. p. 10 (lines 5-11); p. 139 (lines 18-23).

**RESPONSE:   Disputed.  Again, Bill Bensing is the Director of Public Services, not the City Planning Director.  (Exhibit 56, Bensing Dep. 8:25–9:1.)  Mr. Bensing has held neither the non-existent post of "City Planning Director" for thirty years, nor his current position as Director of Public Services for thirty years, as he assumed that position in April 2014 (four years ago).  (*Id.* 8:25–9:4.)  Defendants do not dispute that Mr. Bensing could not recall another situation where a staff error permitted a project to go forward, but then the approval was later retracted.  Further responding, immaterial.**

177.    Jack Schenck, building commissioner for the City of Kirkwood for nearly 30 years, was not aware of any time during his working at the City of Kirkwood that the City ever retracted approval for a project.  *Exhibit 37*, Schenck Dep. p. 10 (lines 9-12).

**RESPONSE:   Disputed. Additionally, Defendants object because the cited testimony does not support this statement of fact other than that Mr. Schenck is the Kirkwood Building Commissioner.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at *2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  The cited testimony states in full: "Q. What is your current occupation?  A.  Building commissioner for the City of Kirkwood, and I'm also building commissioner for the City of Clarkson Valley." (Pls.' Ex. 37 10:9–12.)  The testimony says nothing about retractions of approvals for projects.  (*Id.*)  Further, Mr. Schenck has been the Building Commissioner of Kirkwood for five years, not thirty years, as Plaintiffs claim.  (Pls.' Ex. 37, 10:9–15.)  Further responding, immaterial.**

178.    George Stock, Vianney's lead consultant, thought it was total "BS" when the city attorney told Mike Loyet seven months after approval of the project that the City made a mistake in June 2015 when it approved the lights.  *Exhibit 31*, Stock, Dep. p. 152- 153.

**RESPONSE:   Undisputed, but immaterial as George Stock's feelings have nothing to do with any issue in this case.**

179.    Jacob Buening, the civil engineer with Stock & Associates, also stated he never had a situation like this in his entire career.  *Exhibit 33*, Buening Dep. p. 52 (lines 7- 12).

**RESPONSE:   Undisputed, but immaterial.**

180.    Vianney submitted a plan for site plan approval in the fall of 2016.  *Exhibit 47*.

**RESPONSE:   Disputed.  Vianney submitted a plan for site plan approval in the fall of 2015, after it had substantially completed construction on the north field.  (Exhibit 55, Dep. Ex. 100; Exhibit 54, De Phillips Dep. 24:17–25:6; Exhibit 32, KWD_002200–18, at KWD_002201.)  Defendants further dispute that Plaintiffs' Exhibit 47, which is Vianney's application for a variance submitted a year later, reflects Vianney's application for site plan approval or in any way supports this statement of fact.  Further responding, immaterial.**

181.    In its effective denial of the site plan, the City of Kirkwood cruelly allowed Vianney to turn on its lights on the Sports Field Property yet limited the light to be so dim as to allow light spillage to be .1-foot candle – an amount of light so dim that rendered the Sports Field Property unsafe to compete and practically worthless.  *Exhibit 34*, Stych dep. p. 70 (lines 2-23); *Exhibit 48*.

**RESPONSE:   Disputed.  As the Planning and Zoning Commission minutes reflect, the City *approved* and did not deny Vianney's site plan, but imposed certain conditions thereon.  (Pls.' Ex. 48 ("The motion to approve the project in accordance with the Subcommittee Report passed six to one").)   Nothing in the materials cited or the record indicate that the Commission's approval was an "effective denial."  A denial would have resulted in Vianney tearing out the dugouts and stadium seating that it had installed without a building permit. The City did not require Vianney to remove the dugouts, stadium seats, or other improvements, and Vianney is able to use all of the field improvements despite constructing the same without a building permit or site plan review, in violation of the Zoning Code. Further, there is nothing in the record to support the assertion that Defendants were "cruel" when they allowed Vianney to use lights in accordance with the Lighting Regulations.**

**Moreover, the entire premise of this statement of fact simply disregards the various City Boards' powers.  Planning and Zoning lacks the authority to approve a Site Plan that violates the City's Zoning Code, which provides that in "approving an application for site plan review, the Planning and Zoning Commission may impose conditions, restrictions, and prescribe development standards" but "[i]n no event, however, shall any permitted use or use regulations be varied so as to make them less restrictive than prescribed in the district,**

23

or other applicable regulations." (**Exhibit 6**, KWD_004092–277, at KWD_004117.) **Nor can the City issue a building permit that violates any provision of the Zoning Code without a variance granted by the Board: "No such building permit shall be issued in violation of the provisions of this Code." (*Id.* at KWD_004270.) Thus, even if the Planning and Zoning Commission had wanted to allow Vianney to use its sports lights at levels fifty times that permitted by the Code (as Vianney desires), it lacked the power to grant such permission.**

**Defendants further dispute that the site plan approval rendered the north field "unsafe to compete and practically worthless." Again, Vianney can continue to fully and safely use the field for sports during the day, as it has for over half a century. (Exhibit 2, De Phillips Dep. 14:15–17, 15:12–17; Exhibit 1, Loyet Dep. 85:18–86:1, 108:24–109:3.) Additionally, it can use the field at night for soccer and lacrosse practices. (Exhibit 27, Nov. 14 Tr. 89:14–90:10 (indicating Vianney can use the lights for soccer and lacrosse practices within Code); Exhibit 31, Nov. 28 Tr. 15:17–18 (same).)**

182.    Further, without any basis in its code of ordinances, the City limited the use of lights to athletic games and practice, only, and required them to be off at 9:00 p.m. nine months out of the year, and 10:00 pm, the three months out of the year after the baseball season ends. *Exhibit 48*.

**RESPONSE:   Disputed that the City's limitations were "without any basis in its code of ordinances."  Section 220.8 of the Zoning Code provides the Commission with authority to impose conditions and restrictions in the site plan review process as long as the site plan does not make the conditions *less restrictive* than the Code requires.  (Exhibit 6, KWD_004092–277, at KWD_004117.)**

183.    In addition, without a reference to any code provision, the City limited amplified sound at the Sports Field Property to be used only at athletic games, not practices, and only for announcements, not music prayer, fellowship and thus precluded it from using the Sports Athletic Property from using amplified sound to simply worship on the field. *Exhibit 48*.

**RESPONSE:   Disputed that the City's limitations were "without a reference to any code provision."  Section 220.8 of the Zoning Code provides the Commission with authority to impose conditions and restrictions in the site plan review process as long as the site plan does not make the conditions *less restrictive* than the Code requires.  (Exhibit 6, KWD_004092–277, at KWD_004117.)  Further, disputed as the site plan conditions nowhere mention "music prayer," "fellowship," or "worship"—likely because such uses of the field were never mentioned by Vianney to the Commission.  (Pls.' Ex. 48.)**

184.    The sound requirements imposed by the Planning and Zoning Commission at the site plan review even though sound is "not within the purview of planning," as sound issues are based on the general "nuisance" ordinance of the City.  *Exhibit 38*, Bensing Dep. p. 115 (lines 8-25).

**RESPONSE:   Disputed.  Defendants object because the cited testimony does not discuss the purview of site plan review or powers of the Planning and Zoning Commission whatsoever. *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  Also, imposing additional sound requirements are most certainly within the power of Planning and Zoning, as the Zoning Code *requires* the Commission to consider sound buffering: "[r]easonable visual and sound buffering should be provided for all dwelling units located in the surrounding area."   (Exhibit 6, KWD_004092–277, at KWD_004116.)   Additionally, Section 220.8 of the Zoning Code provides the Commission with authority to impose additional conditions and restrictions in the site plan review process as long as the site plan does not make the conditions *less restrictive* than the Code requires.  (Exhibit 6, KWD_004092–277, at KWD_004117.)**

185.    The City does not have an ordinance directly related to the level of sound, rather, it is dictated by nuisance.  *Exhibit 38*, Bensing dep., p. 115 (lines 8-14).

**RESPONSE:   Disputed.  (Exhibit 37, Kirkwood Ordinance 10378, § 17-69–17-70 ("It shall be unlawful for any person to make, continue or cause to be made or continued any loud, unnecessary or unusual noise or any noise which unreasonably or unnecessarily either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others in the city.") (listing specific activities that shall constitute a violation of the noise ordinance, including certain uses of loudspeakers and yelling).)**

186.    In response to the Planning and Zoning decision, Vianney submitted a variance request to allow full use of the sound and lights, which, included some very severe self-imposed restrictions on lighting and sound, along with use and rental.  *Exhibit 49*.

**RESPONSE:   Disputed.  First, Plaintiffs' Exhibit 49 in no way supports this statement of fact, as it contains the application for site plan review, not Vianney's variance application. (Pls.' Ex. 49.)  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  Second, Vianney did not submit a**

variance request to allow full use of the sound and lights.  Its variance application did not address the sound system's use *whatsoever*, as Vianney conceded during the hearings before the Board of Adjustment.  (**Exhibit 27**, Nov. 14, 2016 Tr. 56:22–57:13; *see also* **Exhibit 58**, KWD_002136–59.)  Defendants also dispute that Vianney's "self-imposed restrictions" were "severe."

187.    The City rejected the variance application submitted in the fall of 2016.  ***Exhibit 50***.

**RESPONSE:    Undisputed that Defendants' October 2016 variance application was denied after multiple hearings, but Defendants object because Plaintiffs' Exhibit 50 in no way supports this statement of fact, as Plaintiffs' Exhibit 50 is a letter addressing whether certain correspondence from the City Planner constituted a "use determination." *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").**

188.    In December 2017, approximately one year later, the School created a photometric plan that would allow it to meet the City lighting code wherein the existing lights could be used and the light spillage on adjacent property at the property line to be less than or equal to .1-foot candle.  ***Exhibit 38***, Bensing Dep. p. 130 (lines 4-25); ***Exhibit 34***, Stych Dep. p. 114 (lines 1-25), p. 115 (lines 1-4), p. 131 (lines 1-23), p. 147 (line 25); p. 148 (lines 1-3); ***Exhibit 51***.

**RESPONSE:    Disputed.  Further, Defendants move to strike this statement of fact.  This statement of fact is improper on multiple levels.  First, Plaintiffs' Exhibit 51 was *not* created in December 2017, but (other than the first page, addressed *infra*) was created in September 2016, as part of the site plan review process, as that exhibit reflects on its face. (Pls.' Ex. 51.) As the Commission restricted the School's use of the lights until "the applicant provides a certification satisfactory to the Director of Public Services validating and confirming that the lights are in conformity with the Illumination Levels set forth in Section 1040.5 of the Zoning Code", Vianney was required to obtain such a certification.  (Pls.' Ex. 48.)  Vianney sought a variance *from that plan*, which the Board of Adjustment denied and which led to this litigation.**

**Defendants further object because Mr. Bensing's testimony does not support this statement of fact whatsoever, and even indicates he was never presented with a photometric plan that complied with the Lighting Regulations.  (Exhibit 56, Bensing Dep. 129:25–130:3.) Finally, the *October* 2017 photometric plan that Vianney created and appears to be the subject matter of this statement of fact (page 1 of Plaintiffs' Exhibit 51) was created for purposes of mediation, is subject to the confidentiality provisions of the mediation agreement**

between the parties, and is inadmissible for any purpose in this litigation as confidential mediation material.

189.     Prior to submitting the plan for review, and rather than accepting, reviewing and approving Vianney's plan, the City of Kirkwood amended its lighting code and changed it so Vianney's lighting plan would be rejected as well as any other method of Vianney using its lights as it could never meet its requirements. *Exhibit 38*, Bensing Dep. p. 134 (lines 19-25), p. 135 (lines 1-25), 136 (lines 1-25), p. 137 (lines 1-25), p. 138 (lines 1-4); *Exhibit 52*, City of Kirkwood's new lighting ordinance.

**RESPONSE:   Disputed in part.  Defendants do not dispute that Vianney never submitted the photometric plan to the City of Kirkwood for review.  Defendants also do not dispute that the City amended its Lighting Regulations to clarify the language therein.  Indeed, the cited testimony reflects that the clarifications were to prevent a situation that, it could be argued, complies (in a hyper-technical fashion) with the Lighting Regulations but would conflict with other provisions of the Lighting Regulations and would violate the spirit and intent of the Code, which is to "to strike a balance of safety and aesthetics by providing lighting regulations that protect drivers and pedestrians from glare and reduce to reasonable limits the trespass of artificial lighting onto neighboring properties and public or private rights-of-way." (Exhibit 6, KWD_004092–277, at KWD_004263.)  Specifically, Vianney wanted to take advantage of one sentence in the Lighting Regulations that could be interpreted to allow the determinative measurement of the light levels to be taken only at grade at the property line so that if a fence were built and a lighting measurement were taken at the base of the fence, it would bring the illumination levels into compliance by an artificial, meaningless measurement.  Vianney's scheme would have violated other provisions of the Code and the clear intent and spirit of the Code, which was to protect the neighboring residents from excessive light trespass.  The revisions simply clarified the Lighting Regulations so that no one could circumvent the Lighting Regulations in such a manner.  Again, the fact that Vianney is making this argument is wholly improper as the photometric plan was part of mediation discussions that are confidential and cannot be used for any purpose in this litigation.  Further, this statement of fact is wholly immaterial as Vianney never built a fence and has no right to challenge the City's amendment of its Lighting Regulations.**

190.     Signs for Jesus v. Town of Pembroke, New Hampshire, Complaint. *Exhibit 53*.

**RESPONSE:   This is not a statement of fact, is meaningless and incomprehensible, and should be stricken.**

191.   Kirkwood High School considers Vianney generally to be the same in terms of high school scholastics and athletics.   ***Exhibit 55***, Romay dep, p. 120 (lines 14-16).

**RESPONSE:   Disputed, and immaterial.   (Exhibit 59, Romay Dep. 120:23–121:13.)**

192.   Kirkwood High School considers Vianney's use of its Sports Field Property to be the same as Kirkwood High School's use of the baseball field.   ***Exhibit 55***, Romay dep, p. 120 (lines 3-6).

**RESPONSE:   Disputed in part as Kirkwood High School does not have lights on its baseball field.   (Exhibit 33, Romay Dep. 8:25–9:2, 62:6–8; Exhibit 1, Loyet Dep. 107:8–14.)   Further responding, Defendants incorporate Plaintiffs' admission of Defendants' Statement of Undisputed Material Fact ¶ 59.   Undisputed that both schools use their baseball field for baseball, but immaterial.**

193.   Kirkwood High School "is subject to the zoning regulations of the City of Kirkwood."   ***Exhibit 55***, Romay dep, p. 36 (lines 20-25).

**RESPONSE:   This is not a statement of fact, but a statement of law and should be disregarded by the Court and stricken.   *Williams v. Cent. Transp. Int'l, Inc.*, No. 4:13-CV-2009 CEJ, 2015 WL 2254608, at \*6 (E.D. Mo. May 13, 2015) ("A court can 'consider only admissible evidence and [must] disregard portions of . . . depositions that . . . purport to state legal conclusions as fact.'"), *aff'd*, 830 F.3d 773 (8th Cir. 2016).   Further, Missouri law sets forth the scope and extent a State entity, such as a public school, is subject to municipal ordinances and no amount of testimony on the subject can overrule such case law.   Further responding, undisputed in part.   Kirkwood High School is subject to the Kirkwood Code of Ordinances to the extent recognized by Missouri law.   *Normandy Sch. Dist. v. City of Pasadena Hills*, 70 S.W.3d 488, 494 (Mo. Ct. App. 2002) (emphasis added) (articulating the very narrow authority of municipalities over public schools).**

194.   The City did not require Kirkwood High School to go through site plan review for the natatorium.   ***Exhibit 38***, [sic] Bensing Dep. p. 106 (lines 8-25); ***Exhibit 54***, Sarah Milunski, Assistant City Attorney, Vianney variance hearing testimony, p. 68 (lines 11- 12); ***Exhibit 57***, Schenck email to Kirkwood approving final "site plan" for natatorium without a public hearing.

**RESPONSE:   Disputed, and immaterial.   The cited evidence does not support this statement of fact. In fact, Mr. Bensing testified that Kirkwood High School *did* go through site plan**

review at a staff level.  (Pls.' Ex. 36, 106:8–20; *see also* Pls.' Ex. 37, 32:18–24 ("Q.   Okay.  And so in your experience, is Kirkwood High School required to go through a site plan review process in any way?    A.   I believe so.   The planner typically does do a site plan review of that, yes.  A site plan is given with each permit, you know, if it's exterior items.").)  Plaintiffs' Exhibit 54 is wholly unrelated and did not indicate whether Kirkwood High School was subject to site plan review, but merely indicated that the *Board of Adjustment* did not review site plans or conduct site plan review.  Ms. Milunski's admonition was given in response to a resident's question as to whether a site plan would be produced to the *Board of Adjustment* for *its* review.  (*See* Pls.' Ex. 54.)  Finally, Plaintiffs' Exhibit 57 demonstrates that there *was* a staff level site plan review of Kirkwood High School's Natatorium plans.  Thus, the very evidence cited by Plaintiffs rebuts this statement of fact.  Regardless, Missouri law sets forth the scope and extent a State entity, such as a public school, is subject to municipal ordinances.  *Normandy Sch. Dist. v. City of Pasadena Hills*, 70 S.W.3d 488, 494 (Mo. Ct. App. 2002) (emphasis added) (articulating the very narrow authority of municipalities over public schools).  Given Kirkwood's limited scope of authority over Kirkwood High School, it is an invalid comparator as a matter of law.  *Signs for Jesus v. Town of Pembroke, NH*, 230 F. Supp. 3d 49 (D.N.H. 2017).

195.   The City did require Vianney to go through site plan approval.  *Exhibit 47*.

**RESPONSE:   Undisputed, although Vianney failed to go through site plan approval, as required, prior to beginning construction and was allowed to continue the construction with the admonition and recognition that the site was subject to terms and conditions that might be imposed by Planning and Zoning during the site plan review process that could affect the construction work that should not have commenced prior to site plan approval.  Defendants further object because Plaintiffs' Exhibit 47, which is Vianney's application for a *variance*, reflects Vianney's application for site plan approval or in any way supports this statement of fact.**

196.   The City did not place conditions on approval of building permits for Kirkwood

High School.  *Exhibit 37*, Schenck Dep. p. 32 (lines 7-10); *Exhibit 38*, [sic] Bensing Dep. p. 56.

**RESPONSE:   Disputed, but immaterial.  Defendants object because the cited testimony does not support this statement of fact.  In fact, the cited testimony from Mr. Schenck does not even discuss *Kirkwood High School*.  (Pls.' Ex. 37, 32:7–10.)  Further, the testimony from Mr. Bensing contradicts this purported statement of fact as he testified that there *were* some conditions placed upon the approval of the building permit, including compliance with the Fire Marshall's maximum separation to the building for the fire lane.  (Exhibit 56, 56:8–13.)  Regardless, Missouri law sets forth the scope and extent a State entity, such as a public school, is subject to municipal ordinances.  *Normandy Sch. Dist. v. City of Pasadena Hills*, 70 S.W.3d 488, 494 (Mo. Ct. App. 2002) (emphasis added) (articulating the very narrow authority of municipalities over public schools).   Given Kirkwood's limited scope of authority over Kirkwood High School, it is an invalid comparator as a matter of law.  *Signs for Jesus v. Town of Pembroke, NH*, 230 F. Supp. 3d 49 (D.N.H. 2017).  Further, Kirkwood**

**High School sought a building permit before starting construction of the natatorium, which is what Vianney should have done, and if Vianney had sought a building permit *prior* to construction, all facets of the project, including lighting, would have been reviewed by Planning and Zoning prior to commencement of construction.**

197.  The City did imposed [sic] conditions on Vianney on its building permits.

***Exhibit 37***, Schenck Dep. p. 32 (lines 7-10).

**RESPONSE:  Undisputed that the City placed conditions on Vianney's building permit, indicating that it was subject to planning and zoning approvals because Vianney had improperly started construction prior to obtaining site plan approval or a building permit. (Pls.' Ex. 37, 32:7–17.)  Thus, the conditions imposed were due to Vianney's failure to comply with the Zoning Code's requirement that it obtain a building permit prior to beginning construction.  Also, the conditions were an accommodation to Vianney because the City could have prevented the continuation of the illegal construction until final site plan approval.**

198.  The City did not impose restrictions on the hours, brightness and purpose on the parking lot lights at the natatorium of Kirkwood High School.  ***Exhibit 55***, Romay dep, p. 93 (lines 1-6).

**RESPONSE:  Undisputed, but immaterial.  Under the Lighting Regulations, *parking lots* are subject to *minimum illumination levels* because they, obviously, are for the safety of the public using the parking lot.  Thus, parking lot lights implicate an entirely different provision of the Lighting Regulations.  (Exhibit 6, at § 1040.5(1) (emphasis added) ("The maintained *minimum* illumination level for parking lots shall be 1.0 footcandles (fc) at finished grade").)  It would, therefore, require a variance to dim the lights below the minimum illumination level or to restrict the number of hours the parking lot lights are on, as Vianney suggests.  Moreover, like the football field lights at Kirkwood High School, Vianney has not presented any evidence that there is any light trespass from Kirkwood High School's parking lot lights onto neighboring residential properties in violation of the Lighting Regulations.  Thus, this statement of fact is wholly immaterial to any matter in this case.**

199.  The City imposed restrictions on the hours, brightness and purpose of the lights on Vianney at its Sports Field Property.  ***Exhibit 56***.

**RESPONSE:  Undisputed, but Defendants object because Plaintiffs' Exhibit 56 (relating to third-party rentals of the field) in no way supports this statement of fact, which should consequently be ignored and stricken.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of**

material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").

200.     The City of Kirkwood does not restrict Kirkwood High School from using or renting of its athletic fields.  *Exhibit 38*, [sic] Bensing Dep. p. 61 (lines 7-15).

**RESPONSE:   Undisputed, but immaterial.  Missouri law sets forth the scope and extent a State entity, such as a public school, is subject to municipal ordinances. *Normandy Sch. Dist. v. City of Pasadena Hills*, 70 S.W.3d 488, 494 (Mo. Ct. App. 2002) (emphasis added) (articulating the very narrow authority of municipalities over public schools).  Additionally, Kirkwood High School property is public property that is subject to the rules and regulations set by the School Board, similar to the City's public property.  Given Kirkwood's limited scope of authority over Kirkwood High School, it is an invalid comparator as a matter of law. *Signs for Jesus v. Town of Pembroke, NH*, 230 F. Supp. 3d 49 (D.N.H. 2017).**

201.     The City of Kirkwood did restrict the use of Vianney to rent out its athletic field.

*Exhibit 56*.

**RESPONSE:   Disputed in part.  Defendants do not dispute that Vianney may rent its facilities out to third parties as long as they are in situations that are accessory uses to the property's use as a private school.  Defendants do dispute that Vianney has ever sought or Defendants have ever restricted Vianney's rental of any of its facilities, as there is no support for such in the record.**

202.     The City does not restrict amplified sound at Kirkwood High School's baseball field.  *Exhibit 38*, [sic] Bensing Dep. p. 61 (lines 3-6); *Exhibit 55*, Romay dep, p. 62 (lines 23-25), p. 63 (line 1); *Exhibit 56*.

**RESPONSE:   Disputed in part.  As an initial matter, neither the testimony from Mr. Bensing (which addresses Kirkwood High School's *football field*) nor Plaintiffs' Exhibit 56 (relating to third-party rentals of *Vianney's* field) support this statement of fact.  Further, to the extent permitted by Missouri Law, Kirkwood High School is subject to the same sound Ordinances as Vianney.  (*See* Exhibit 37, Kirkwood Ordinance 10378, § 17-69–17-70 ("It shall be unlawful for any person to make, continue or cause to be made or continued any loud, unnecessary or unusual noise or any noise which unreasonably or unnecessarily either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others in the city.") (listing specific activities that shall constitute a violation of the noise ordinance, including certain uses of loudspeakers and yelling).)**

203.    The City does restrict the amount, the time and the purpose of amplified sound at

Vianney's Sports Field Property.  *Exhibit 56*.

**RESPONSE:  Undisputed, although Defendants object because Plaintiffs' Exhibit 56 (relating to third-party rentals of the field) in no way supports this statement of fact, which should consequently be ignored and stricken.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").**

204.    Despite Vianney's compliance, the City placed severe limitations on the use of the

lights and sounds system pursuant to the site plan restrictions and still outright denied its variance.

*Exhibit 56*.

**RESPONSE:  Defendants object because Plaintiffs' Exhibit 56 (relating to third-party rentals of the field) in no way supports this statement of fact, which should consequently be ignored and stricken.  *Wenzel v. City of Bourbon*, No. 4:16 CV 27 DDN, 2017 WL 1355485, at \*2 (E.D. Mo. Apr. 13, 2017) ("When supporting or disputing statements of material fact offered to support a motion for summary judgment, the opposing party may object that such a statement is not supported by admissible evidence.").  Further responding, Defendants are unclear what Vianney is referring to when it states "despite Vianney's compliance" and, therefore, dispute the same.  Defendants further dispute that the limitations imposed by the Planning and Zoning Commission were "severe" and there is no evidence to support this statement. (Pls.' Ex. 48.)  Defendants do not dispute that the Board of Adjustment denied Vianney's variance application because Vianney failed to meet its high burden to demonstrate it was entitled to a variance.**

205.    When asked at his deposition to "Describe for me if you would, Mr. Loyet, how

baseball and soccer in your judgment are a religious activity?"  Vianney's President Michael Loyet

eloquently responded:

> It's going to be a long answer.  So, one of the tenants of the characteristics of Marianist education -- well, five of them, and you've seen that in print already -- but the formation in faith, the integral quality education, the family spirit, the service, justice, and peace, and adaptation and change are five pillars of our Marianist faith.  Athletics are a significant part of the educational process.  And so, when you talk about any program athletically, that is helping us to form our young men.  That's part of that personal excellence in the Catholic Marianist tradition that's part of our mission.  So every opportunity we get to work with the young

men in athletics is helping us to fulfill that mission.  ***Exhibit 32***, Loyet Deposition, p. 59 (lines 12-25, p. 60 (lines 1-8).

**RESPONSE:   Disputed that Mr. Loyet's response was eloquent, but undisputed that he offered this self-serving statement, which is not supported by the actual Five Characteristics of Marianist Education. (<u>Exhibit 35</u>, Characteristics of Marianist Education.)**

206.    While the City takes great pride at pointing out some parts of the deposition testimony of Mr. DePhillips concerning his understanding of the mission of the school, they neglect to inform the Court of this important fact that he testified to at his deposition: "As far as discussions about the mission and about whether we could or couldn't, my role is very different than Mike Loyet's.  My role does not, not include, my responsibilities do not include discussions about the mission and all those kinds of things.  My role, my role is to deal with the construction and deal with the contractor and deal with moving the project forward.  Mine is not a mission, my responsibilities don't include furthering of the mission.  All employees of Vianney are there to further the mission.  Not my primary responsibility of the project."  ***Exhibit 43***, DePhillips Dep. p. 47 (lines 19-25) p. 48 (lines 1-9); "And to go back to it, I, you know, I – my role is not to get involved with the mission and all those kinds of things.  My role was to get this thing built."

***Exhibit 43***, DePhillips Dep. p. 75 (lines 5-8).

**RESPONSE: Defendants dispute Plaintiffs' characterization of the information Defendants provided to this Court and note that the quotation of Mr. De Phillips testimony is inaccurate, but Plaintiffs' alterations (here, at least) are immaterial.  Further, Mr. Loyet's testimony refutes that Mr. De Phillips was somehow disassociated from the school's mission, as he testified that Mr. Loyet himself had discussions with Mr. De Phillips concerning the lights and Vianney's religious mission.  (<u>Exhibit 60</u>, Loyet Dep. 263:25–264:14.)  Notably, Mr. De Phillips did not recall those alleged conversations.  (<u>Exhibit 54</u>, De Phillips Dep. 47:13-47:16 ("Q. Were there discussions specifically that you could not fulfill your religious mission if you didn't have lights on this field in early 2015?  A   Not that I recall.").)**

207.    When asked at deposition what the compelling governmental interest is in the .1-foot candle lighting, the City representative merely said, "protecting the adjacent neighbors." *Exhibit 38*, [sic] Bensing Dep. p. 27 (lines 1-12).

**RESPONSE:  Disputed.  Mr. Bensing was not a corporate representative for the City. Further, the purported quote is not contained in the cited testimony (or elsewhere in his deposition). (Exhibit 56, Bensing Dep. 27:1–12.) Additionally, the compelling government interest and articulated purpose of the Lighting Regulations is set forth in the Code itself: the stated "Purpose" of the Lighting Regulations is "to strike a balance of safety and aesthetics by providing lighting regulations that protect drivers and pedestrians from glare and reduce to reasonable limits the trespass of artificial lighting onto neighboring properties and public or private rights-of-way." (Exhibit 6, KWD_004092–277, at KWD_004263.) There is also ample evidence in the record that the Lighting Regulations are intended to protect the public health, safety and welfare of all residents and to protect homeowners from intrusive light trespass.  (Exhibit 6, KWD_004092–277, at KWD_004263; Exhibit 5, Bensing Dep. 28:3–8; Exhibit 7, Spencer Dep. 150:1–4; Exhibit 8, Dec. 5, 2016 Tr. 161:8–12.)**

208.    The lighting regulations enforced at that point after purchase prohibited any meaningful use of the lights for their intended purpose, safe play of competitive sports at night. *Exhibit 34*, Stych Dep. p. 69 (lines 11-25), p. 70 (lines 1-23).

**RESPONSE:  Disputed in part.  Even at the lighting levels permitted by the Lighting Regulations, Vianney testified to the Board of Adjustment that Vianney could use the lights for soccer and lacrosse practices.  (Exhibit 27, Nov. 14 Tr. 89:14–90:10 (indicating Vianney can use the lights for soccer and lacrosse practices within Code); Exhibit 31, Nov. 28 Tr. 15:17–18 (same).)  Further, Defendants note and do not dispute that Plaintiffs again admit that the intended purpose of the north field is not for religious purposes, but for the athletic endeavor of playing "competitive sports at night."**

209.    The City knew it had committed a mistake of its own making as evidenced by the testimony of Ryan Spencer.  *Exhibit 36*, Spencer, p. 28 (lines 9-25), p. 29 (lines 1- 21).

**RESPONSE:   Undisputed, but immaterial to any of the claims in this lawsuit.**

210.    To allow some use of the lights and sound system and to allow the filing for a variance, Vianney completed the process of filing a revised site plan complying with the lighting

regulations, which reduced illumination levels, so it is unsafe for athletics.  ***Exhibit 34***, Stych

Dep. p. 70 (lines 1-21).

**RESPONSE:   Disputed in part.  Undisputed that Vianney was required to comply with the Zoning Code and obtain Site Plan Approval because the Planning and Zoning Commission lacks authority to approve a Site Plan that violates the Zoning Code.  Again, Vianney should have never started construction without a building permit and without Site Plan Approval by the Planning and Zoning Commission.   Thus, the City could have prevented the continuation of the construction and use of the sports field until it got final Site Plan Approval from the Planning and Zoning Commission.   Thus, Vianney's premise that it proceeded to allow some use of the lights and sound system is inaccurate.  Defendants dispute that the permitted lighting levels are unsafe for all athletics, as Vianney testified to the Board of Adjustment that Vianney could use the lights for soccer and lacrosse practices.  (Exhibit 27, Nov. 14 Tr. 89:14–90:10 (indicating Vianney can use the lights for soccer and lacrosse practices within Code); Exhibit 31, Nov. 28 Tr. 15:17–18 (same).)**

Respectfully submitted,

**LEWIS RICE LLC**

By:   /s/ John M. Hessel
      John M. Hessel, #26408MO
      Joseph E. Martineau, #32397MO
      Sarah A. Milunski, #65112MO
      600 Washington Avenue, Suite 2500
      St. Louis, Missouri 63101
      Telephone:  314-444-7600
      Fax:  314-241-6056
      Email: jhessel@lewisrice.com
             jmartineau@lewisrice.com
             smilunski@lewisrice.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing were served via electronic mail to the following parties on this 7th day of May, 2018:

Ronald E. Jenkins
Stephen L. Kling, Jr.
Michael P. Stephens
**JENKINS & KLING, P.C.**
150 North Meramec Ave., Ste 400
St. Louis, Missouri  63105
rjenkins@jenkinskling.com
skling@jenkinskling.com
mstephens@jenkinskling.com

*Lead Attorneys for Plaintiff*

Portia C. Kayser
**FISHER PATTERSON SAYLER
& SMITH, L.L.P.**
1010 Market Street, Suite 1650
St. Louis, Missouri  63101
pkayser@fisherpatterson.com

*Co-counsel for Defendant and Respondent*

Daniel P. Dalton
**DALTON & TOMICH, PLC**
The Chrysler House
719 Griswold Street, Suite 270
Detroit, MI  48226
Tel. (313) 859-6000
ddalton@daltontomich.com

*Attorney for Plaintiff as to the RLUIPA and Constitutional Claims, only*

/s/ John M. Hessel